OPINION OF THE COURT
GREENBERG, Circuit Judge.
I. INTRODUCTION
This case concerns the bankruptcy proceedings of Eric J. Blatstein (“Blatstein”) and the attempt by one of his creditors joined by bankruptcy trustees to bring assets into his bankruptcy estate. The creditor, 718 Arch Street Associates, Ltd. (“Arch Street”), brought these adversary proceedings in the bankruptcy court accusing Blatstein of fraudulently transferring his income and his shares in a number of corporations in the restaurant and bar businesses he controlled to his wife, Lori J. Blatstein. Arch Street also asked the bankruptcy court to reverse pierce the veils of the corporations so as to bring their assets into the bankruptcy estates. The trustees of the Blatstein bankruptcy estate and of the bankruptcy estate of Main, Inc. (“Main”), one of the Blatsteins’ jointly-held corporations, have intervened as plaintiffs in this action. Arch Street predicated its piercing the veil argument on the contention that the corporations were Blatstein’s “alter egos.” As we shall explain, a court in a successful reverse piercing case disregards the corporate existence so that the corporation’s assets become available to a controlling party’s creditors to satisfy his debts. Thus, a reverse piercing case differs from a classical piercing case as in the latter the controlling party is responsible for the corporation’s debts. The bankruptcy court and the district court on appeal rejected these fraudulent transfer and reverse piercing claims insofar as the claims are now before us. Arch Street and the trustees then appealed to this court. We will reverse in part, as we find that Eric Blatstein fraudulently transferred his income to his wife in an effort to keep the money from his creditors. We, however, will affirm in part, as we conclude that the bankruptcy and district courts correctly found that there had not been a fraudulent transfer of corporate shares and correctly refused to pierce the corporate veils.
II. STATEMENT OF THE CASE
This case grew out of Main’s September 20, 1996 voluntary Chapter 11 petition. See In re Main, Inc., 213 B.R. 67, 72 (Bankr.E.D.Pa.1997) (“Main II”), rev’d in part and aff'd. in part sub nom., In re Blatstein, 226 B.R. 140 (E.D.Pa.1998).[1] Main converted its case from a Chapter 11 to a Chapter 7 proceeding after a December 18, 1996 hearing in the bankruptcy court on a motion to dismiss its petition. *93 Blatstein then filed a personal Chapter 7 proceeding on December 19, 1996.
Arch Street subsequently brought these adversary proceedings in both the Blat-stein and Main bankruptcy cases against Eric and Lori Blatstein, Morris Lift, who was the Blatsteins’ accountant and Main’s president, and the Blatsteins’ various jointly-held corporations.[2] For simplicity’s sake, however, we will refer to the appel-lees collectively as “Blatstein” or “the Blatsteins,” as appropriate in the context. Michael H. Kaliner, trustee of the Blat-stein bankruptcy estate, and Mitchell Miller, trustee of the Main bankruptcy estate, intervened as plaintiffs in the proceedings and are appellants here. Nevertheless, we will refer to the appellants collectively as “Arch Street.”
Before filing these proceedings, 718 Arch Street Associates, Ltd. obtained a judgment by confession in state court against Blatstein individually on November 12, 1992, for $2,774,803 on account of a breach of a commercial lease. Subsequently, in connection with garnishment proceedings to enforce the judgment, the state court entered the judgment against Main.
In its complaints in the bankruptcy court, Arch Street alleged, inter alia, that Lori Blatstein was not truly a co-owner of the corporations, Blatstein fraudulently transferred all of his income from the corporations to her to avoid paying his creditors, Blatstein fraudulently transferred Main’s assets to Lift and other corporations he controlled, and the Blatsteins’ corporations were Blatstein’s alter egos and should be held responsible for his debts.
The bankruptcy court held that Blat-stein fraudulently conveyed his assets in Main to Lift and other corporations Blat-stein controlled in a ruling which is not before us for review. Accordingly, pursuant to 11 U.S.C. SS 727(a)(2)(A) and (a)(7) the bankruptcy court refused to discharge him. Main II, 213 B.R. at 85. The court, however, rejected Arch Street’s arguments that the corporate defendants were the alter egos either of Blatstein or of each other and that Blatstein fraudulently transferred his,assets to his wife. Id. at 87-95. The bankruptcy court on further proceedings, which included Arch Street’s motion for reconsideration of the order in Main II, calculated Arch Street’s claim for rents due as $582,443.65. In re Main, Inc., 1997 WL 626544, at *12 (Bankr.E.D.Pa. Oct. 7, 1997) (“Main III”). The court partially granted the motion for reconsideration with respect to the procedural implementation of the order in Main II but did not disturb the substantive dispositions we have described.
On appeal, the district court affirmed the bankruptcy court’s rejection both of Arch Street’s claims that the Blatsteins’ corporations were Blatstein’s alter egos and that he had fraudulently transferred his corporate shares and income to his wife, but reversed and remanded for further proceedings in the bankruptcy court that court’s ruling that Blatstein fraudulently transferred Main’s assets. In re Blatstein, 226 B.R. 140, 148 (E.D.Pa.1998).[3] Arch Street now appeals the district court’s order affirming the bankruptcy court’s ruling against its alter ego and fraudulent transfer claims. As we have indicated, we will reverse in part and affirm in part.
III. DISCUSSION
Arch Street contends that the district court erred in rejecting the fraudulent *94 transfer claims because the court failed to take into account (1) Blatstein’s insolvency at the time of the transfers, (2) the Blat-steins’ fraudulent intention in effectuating the transfers, and (3) Lori Blatstein’s failure to prove that she gave reasonably equivalent value for the transfers. Arch Street contends that because of these legal errors, the district court erroneously failed to recognize that Arch Street had proven that the transfers were fraudulent as a matter of law.
Arch Street also contends, on the theory that the Blatsteins’ corporations were his alter egos, that the district court erred in affirming the bankruptcy court’s refusal to pierce the corporate veils. Arch Street argues that the court did not account properly for its contentions that (1) the corporations operated as facades for Blatstein, (2) Blatstein used the corporations to hinder, delay, and defraud his creditors, and (3) Blatstein commingled corporate funds with his personal funds.
Blatstein initially argues, however, that we should not reach the merits of the appeal as we lack jurisdiction to do so. Because this jurisdictional argument would require us to dismiss the appeal without considering the case on the merits, we will deal with it first. Alternatively, Blatstein urges that we affirm the district court’s order.
A. Standard of Review
We exercise plenary review over the question of whether we have jurisdiction to entertain this appeal. See In re Meyertech Corp., 831 F.2d 410, 413-14 (3d Cir.1987). Likewise, we have plenary review over the district court’s application of legal precepts. See In re Brown, 951 F.2d 564, 567 (3d Cir.1991). On the other hand, we review the bankruptcy court’s factual findings for clear error. See id. See also In re Foxcroft Square Co., 184 B.R. 671, 675 (E.D.Pa.1995) (“[T]he determination of whether there is ... intent to defraud [under Pennsylvania law] is a finding of fact which should not be set aside on appellate review unless that finding was clearly erroneous.”)' (citing United States v. Tabor Ct. Realty Corp., 803 F.2d 1288, 1304 (3d Cir.1986); In re Adeeb, 787 F.2d 1339, 1342 (9th Cir.1986)).
B. Whether our jurisdiction is properly invoked
As we have indicated, before reaching the merits of this dispute we first must determine whether we have jurisdiction. This jurisdictional issue is implicated because the district court’s order in part remanded the case for further proceedings in the bankruptcy court. Moreover, there will be additional proceedings involving numerous issues with respect to the bankruptcy estates in both the district and bankruptcy courts.
In bankruptcy cases, we have jurisdiction pursuant to 28 U.S.C. § 158(d) over appeals from “final decisions, judgments, orders, and decrees entered,” as here, by a district court in its appellate capacity under 28 U.S.C. § 158(a). Yet, we have recognized that in a bankruptcy context we consider the question of whether an order or judgment is final “in a more pragmatic and less technical sense than in other matters .... ” Meyertech Corp., 831 F.2d at 414. Determining whether an appellant has invoked our jurisdiction properly entails “balancing a general reluctance to expand traditional interpretations regarding finality and a desire to effectuate a practical termination of the matter before us.” Id. The relevant factors consist of (1) the impact of our consideration of the merits of the appeal upon the assets of the bankrupt estate, (2) the necessity for further fact-finding on remand, (3) the preclusive effect of a decision on the merits on further litigation, and (4) whether the interest of judicial economy would be furthered by the exercise of jurisdiction. Id. We have held that the impact upon the assets of the estate is the “most important” factor in this balancing scheme. See In re Market Square Inn, Inc., 978 F.2d 116, 120 (3d Cir.1992).
*95 Applying these factors here, we conclude that we have jurisdiction to consider Arch Street’s appeal, as all four factors weigh in favor of our exercise of jurisdiction. First and foremost, this appeal concerns identifying assets of Blatstein’s estate. Plainly, a reversal of the district court’s order and a determination that Blatstein fraudulently conveyed his assets to his wife or that the Blatsteins’ corporations are his alter egos, would result in the inclusion in his bankruptcy estate of substantial assets which then would be available to satisfy, at least in part, his creditors’ claims. On the other hand, if we were to affirm the district court’s order, the assets in the estate effectively would be determined.
Second, contrary to Blatstein’s assertion in his brief, we find no need for additional fact-finding on remand. This appeal concerns three overarching matters, two involving fraudulent transfers and one involving piercing corporate veils, none of which will be duplicated in further proceedings in the district or bankruptcy courts, and none of which depends upon any facts still at issue or which will be determined during subsequent proceedings. Third, there can be no question but that our decision will be preclusive. Finally, we serve judicial economy by consideration of these claims. Thus, we conclude that we have jurisdiction and will consider this appeal on the merits. See In re Simpson, 36 F.3d 450, 452 (5th Cir.1994) (per curiam) (exercising jurisdiction over a trustee’s appeal of a district court’s order reversing the bankruptcy court’s finding of a fraudulent transfer of an asset).
C. The fraudulent transfer claims
1. An overview
The bankruptcy court rejected Arch Street’s claims that Blatstein fraudulently transferred his stock in the jointly owned corporations and his income derived from the businesses to Lori Blatstein. In this regal’d it reasoned that all of the stock certificates indicated that the Blatsteins owned the corporations as tenants by the entireties and had so owned them since their inception. Moreover, it accepted Lori Blatstein’s testimony that the couple had opened her personal bank account and deposited Blatstein’s income into it because of his bad reputation with banks and to avoid a federal tax lien on Blatstein’s assets. Main II, 213 B.R. at 93-95. The bankruptcy court’s decision rested, then, upon its belief that (1) Blatstein did not transfer assets to Lori Blatstein, and (2) if there were any transfers from Blatstein to Lori Blatstein, then in making the transfers Blatstein did not possess an actual intent to defraud his creditors under Pennsylvania law which the parties agree is applicable.
On reconsideration, the bankruptcy court again rejected Arch Street’s fraudulent transfer claims. Main III, 1997 WL 626544, at *4-*6. This time the court rejected a “constructive fraud” theory of intent by pointing out that Blatstein’s income came from the corporations the Blat-steins co-owned, and thus “were not the same as paychecks from a third-party employer,” but instead “could be viewed as distributions of dividends or equity from the corporations.... ” Id. at *6. Therefore, the court implicitly found that Blat-stein did not transfer any earned income to Lori when he deposited his income into her personal accounts. Moreover, inasmuch as Lori used these deposits to satisfy the Blatsteins’ joint obligations and the debts of the various corporations, the court found it “impossible, on this record, to find that ‘reasonably equivalent value’ was not given to Blatstein and the corporations in exchange for their deposits into these accounts.” Id. The district court affirmed the bankruptcy court’s findings on these issues. Blatstein, 226 B.R. at 159-60.
On this appeal, Arch Street contends that the bankruptcy court’s factual findings should have led that court to conclude that Blatstein possessed an actual intent to defraud his creditors when he issued stock in Lori’s name and when he made deposits into Lori’s personal accounts. Arch Street *96 also argues that even if we were to find that Blatstein did not actually intend to defraud his creditors, we should hold that his transfers were fraudulent because they fail Pennsylvania’s “constructive fraud” analysis applicable in fraudulent transfer cases. Arch Street contends that the bankruptcy and district courts erred by incorrectly placing the burden of proof on it, instead of shifting the burden to Lori to establish by clear and convincing evidence either that Blatstein was solvent at the time of the transfers or that she gave him fair consideration for the conveyances. We will affirm the district court’s order affirming the bankruptcy court’s finding that Blatstein did not fraudulently transfer corporate shares to his wife, but will reverse the district court’s order affirming the bankruptcy court’s finding concerning his income transfers to her personal bank account.
Initially on these fraudulent transfer issues we set forth the germane state law. The Pennsylvania Uniform Fraudulent Transfer Act (“PUFTA”) provides that a “transfer made or obligation incurred by a debtor is fraudulent as to a creditor, ... if the debtor made the transfer or incurred the obligation: (1) with actual intent to hinder, delay or defraud any creditor of the debtor; or (2) without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor” was insolvent at the time of the transfer or became insolvent as a result of it. 12 Pa. Cons.Stat. Ann. § 5104 (West 1999). The first provision provides for liability under an “actual intent” theory of fraud, while the second is a “constructive fraud” provision.
2. The stock “transfers”
The bankruptcy and district courts rested their holdings on their belief that the Blatsteins did not transfer any stock between them because they owned all the corporate stock at all times from their inception as tenants by the entireties. We agree. Pennsylvania defines an “asset” for PUFTA purposes as the “property of a debtor” but not including “an interest in property held in tenancy by the entireties to the extent it is not subject to process by a creditor holding a claim against only one tenant.” 12 Pa. Cons.Stat. Ann. § 5101(b). Thus, if the Blatsteins always owned their corporations as tenants by the entireties, Arch Street’s allegation that Blatstein transferred them to Lori Blatstein to defraud his creditors must fail.
We reach this conclusion even in the face of evidence that Blatstein alone provided or arranged for the assets to establish the businesses and that Lori Blatstein did not know that she was a joint owner of the corporations.[4] As the bankruptcy court noted, Pennsylvania law presumes that property titled to a husband and wife is owned by them as tenants by the entireties even if only one spouse paid for the property or even if one spouse was unaware of her ownership of the property. Main II, 213 B.R. at 93 (relying upon In re Estate of Holmes, 414 Pa. 403, 200 A.2d 745, 747 (1964)). Because the Blatsteins always had held their corporate shares as tenants by the entireties, Blatstein never “transferred” any shares to his wife, and thus could not have fraudulently transferred the shares to her. Accordingly, we will affirm the district and bankruptcy courts on this point.
3. Blatstein’s income “transfers”
We reject, however, the bankruptcy court’s conclusions with respect to Blat- *867 “Does the defendant’s intent have ANY bearing on *Count 2 (* second element) of the indictment?” The court responded: “The requirements for conviction under the two different counts is made clear by a reading of the instructions.” The district court did not advise defense counsel of these questions or consult with counsel before issuing its answers.
Gaytan was convicted on count 2 and acquitted on count 1.
DISCUSSION
Section 1425(a) provides that “[w]hoever knowingly procures or attempts to procure, contrary to law, the naturalization of any person, or documentary or other evidence of naturalization or of citizenship” shall be guilty of the offense.
The jury was instructed that the elements of § 1425 were that Gaytan “knowingly acquired naturalization,” and that this naturalization was contrary to law. The jury was further instructed that his naturalization was contrary to law because of the theft conviction. Since applying for naturalization, absent the oddest circumstances, is necessarily a knowing act, the jury charge essentially made § 1425 a strict liability offense, one which imposes criminal liability without regard to the defendant’s state of mind at the time he sought naturalization. The government argues that the charge correctly stated the law because § 1425 is a “public welfare” statute which does not have a culpable state of mind requirement. Gaytan appears to argue that the statute requires that he knew that applying for naturalization given his prior conviction was itself a criminal act. For example, he complains on appeal that “[t]he court did not instruct the jury that it needed to find that Mr. Gaytan knew that his procurement of naturalization was illegal.” Stated another way, he contends that criminal liability under § 1425 requires proof that the defendant was familiar with that statute. We cannot agree with either position.
First, we cannot agree with Gaytan that the government had to prove that he knew that applying for naturalization with the prior conviction was illegal. The general rule in the criminal law is that the defendant does not have to know that his conduct is illegal; hence the expression that “ignorance of the law is no excuse.” “The rule that ‘ignorance of the law will not excuse’ is deep in our law....”[1]
The Supreme Court recognized “the venerable principle that ignorance of the law generally is no defense to a criminal charge” in Ratzlaf v. United States.[2] Nevertheless, it held that in 31 U.S.C. § 5322, applicable to structuring financial transactions to avoid federal reporting requirements, Congress decreed otherwise and required proof that the defendant knew the structuring was illegal. This decision rested on the fact that the statute applies to a person “willfully violating” the antis-tructuring provision, and the Court’s conclusion that “currency structuring is not inevitably nefarious.”[3] The Court noted authority that “willful” implies a violation of a known legal duty.[4]
Similarly, in Bryan v. United States,[5] the Court held that a conviction under 18 U.S.C. § 924(a)(1)(D) for “willfully” dealing in firearms without a license requires proof that the defendant knew his conduct was unlawful, but does not require proof that' the defendant was aware of the specific licensing requirement that is the *97 stem’s income transfers to Lori’s personal bank accounts. Unquestionably, Lori would have been entitled to dividends from the corporations. So we would uphold transfers of that nature. But the bankruptcy court held that Eric’s income checks constituted income of that character because the checks “were not the same as paychecks from a third-party employer,” but instead “could be viewed as distributions of dividends or equity from the corporations.... ” Main III, 1997 WL 626544, at *6 (emphasis added).
We reject this conclusion. First, the payments were made by the corporations only to Blatstein and not to Lori Blatstein. Furthermore, the form of payments reflected reality as Blatstein undoubtedly operated the businesses. In fact, as Arch Street pointed out in its brief and again at oral argument, Blatstein treated his paychecks as wages or Schedule C sole-proprietorship income on his tax returns and not as dividends or distributions to a shareholder. Br. at 45. Likewise, the corporations treated the payments as wages or commissions and not as distributions to a shareholder.
While the bankruptcy court viewed the determination of the character of the income as a factual matter, even reviewing for clear error, see Brown, 951 F.2d at 567, we are “left with the definite and firm conviction that a mistake has been committed.” United States v. United States Gypsum Co., 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948). Consequently, we hold that the court’s finding that Blat-stein did not transfer his income to Lori Blatstein was clearly erroneous. In sum, we see no reason why income that in form and fact was earned for services should be reclassified as dividends or equity distributions.
Our conclusion that Blatstein’s income was earned income leads us to consider the bankruptcy court’s finding that he deposited his income into Lori’s accounts because his credit and reputation with banks was poor, and because he “was trying to keep the funds from being seized or frozen by the IRS or other taxing authorities, pursuant to a tax lien, in light of the personal income taxes which he owed to the IRS.” Main II, 213 B.R. at 94. The bankruptcy court further noted that “taxes were paid from[a brokerage] Account, and therefore no fraud on the IRS or other taxing authorities appears to have been effected.” Id. These findings are significant because, notwithstanding the bankruptcy court’s contrary conclusion, they clearly demonstrate that despite the payment of some taxes, Blatstein intended to defraud the Internal Revenue Service, one of his creditors.
PUFTA does not require proof to set aside a transfer that the debtor intended to defraud the specific creditor bringing the fraudulent transfer claim. PUFTA deems a transfer fraudulent if the debtor had the “actual intent to hinder, delay or defraud any creditor.... ” 12 Pa. Cons. Stat. Ann. § 5104 (emphasis added). Similarly, the courts apply the bankruptcy code’s denial of discharge provision, 11 U.S.C. § 727(a)(2)(A), to “require[ ] only that the debtor make the transfer with intent to hinder, delay, or defraud ‘a creditor.’ There is no requirement that the debtor intend to hinder all of his creditors.” Adeeb, 787 F.2d at 1343.
We recognize that the bankruptcy court indicated that Blatstein intended to shield the income to pay some of his debts, including reducing some of his tax liability as the court noted that “taxes were paid from [a brokerage] Account, and therefore no fraud on the IRS or other taxing authorities appears to have been effected.” Main II, 213 B.R. at 94. Nevertheless, as the Adeeb court stated: “Our inquiry under [11 U.S.C. § ] 727(a)(2)(A) is whether [debtor] intended to hinder or delay a creditor. If he did, he had the intent penalized by the statute notwithstanding any other motivation he may have had for the transfer.” 787 F.2d at 1343. We will apply the same principle under PUFTA. *98 See also In re Greene, 202 B.R. 68, 73 (Bankr.D.Md.1996) (holding that debtor’s attempt to avoid one creditor’s collection efforts in an effort to allow him to pay-other creditors “does not change the fact that Debtor transferred ... assets with the actual intent to hinder” a creditor); In re Cooper, 150 B.R. 462, 467 (D.Colo.1993) (holding transfers to wife were fraudulent even though wife was one of debtor’s creditors); United States v. Purcell, 798 F.Supp. 1102, 1113 (E.D.Pa.1991), aff'd, 972 F.2d 1334 (3d Cir.1992) (table) (finding a conveyance fraudulent under PUFTA’s predecessor when defendant attempted to avoid federal tax lien by conveying his property to his wife as a tenant by the entireties). Thus, we conclude that the bankruptcy court’s determination that Blatstein did not have the actual intent to defraud his creditors was erroneous.[5]
Furthermore, although not necessary for our result, we note that the bankruptcy court erred in its “constructive fraud” analysis by incorrectly placing on Arch Street the burden of proving that reasonably equivalent value was not given for the transfer: “[W]e believe that lack of ‘reasonably equivalent value’ for the transfer is not proven.... ” Main III, 1997 WL 626544, at *6. In fact, if the grantor is in debt at the time of a transfer PUFTA places on the grantee the burden of proving by clear and convincing evidence either that the grantor was solvent at the time of the transfer or that the grantee had given reasonably equivalent value for the conveyance. See Elliott v. Kiesewetter, 98 F.3d 47, 56-57 (3d Cir.1996).[6] Inasmuch, as the bankruptcy court found that, “the record supports Blatstein’s insolvency at the time of his transfers to Lori,” Main III, 1997 WL 626544, at *6, Lori could have defeated a constructive fraud claim solely by proving that she gave adequate consideration for the transfers.
The bankruptcy court found Blatstein’s testimony on this issue to be credible and relied upon it to hold that Lori had given reasonably equivalent value for the deposit of his income into her accounts. Specifically, the court reasoned that Lori received income from Blatstein that ultimately could be viewed as a dividend on her half-ownership of the corporations, and used this income to pay off certain of the Blatsteins’ joint debts as well as debts owed by the corporations. Id.
Yet, by failing to place the burden on Lori to prove that she gave reasonable consideration, the court did not adopt the more plausible interpretation of the facts: that Blatstein retained control over the funds despite transferring them to his wife. Lori Blatstein used the funds both for her benefit and that of her husband for such purposes as paying their joint debts and putting aside money for their children’s college educations. These payments suggest that Blatstein’s conveyances were in title only, and that instead of giving her husband consideration in the form of payment of his debts, Lori merely was using the money where Blatstein directed her to use it.
In this regard we note that the bankruptcy court, which had an opportunity to observe the Blatsteins testify, described Lori’s role “as a faithful spouse, homemak *99 er, and occasional business partner.” Without shifting the burden of proof to Lori on the consideration issue, the bankruptcy court could not make a proper ruling on the point. Nevertheless, in light of our holding that Blatstein possessed an actual intent to defraud his creditors, it is not necessary for us to remand for consideration of the income transfers under the constructive fraud provisions of PUFTA.
D. The alter ego claims
Arch Street’s final argument on appeal is that the bankruptcy and district courts erred in failing to reverse pierce the veils of the Blatsteins’ corporations to satisfy Blatstein’s debts. Arch Street contends that the bankruptcy court made the necessary factual findings yet erred in applying the law to these findings, resulting in its erroneous conclusion that the Blatsteins’ corporations were not Blatstein’s alter egos and that they were not the alter egos of each other.[7]
The bankruptcy court held that the Blat-steins’ corporations were not Blatstein’s alter egos despite the presence of some factors that weighed in favor of piercing the corporate veils. For example, the court found that the corporations paid numerous personal expenses of the Blatsteins and made interest-free loans to them. Main II, 213 B.R. at 89-90. Nevertheless, the court declined to pierce the corporate veils, primarily by relying on Arch Street’s expert’s testimony on cross-examination. The expert recognized that the Blatsteins declared these amounts on their joint income tax returns as income, and that the corporations took deductions on their tax returns for these amounts. Id. at 91. Moreover, while he recognized that as a result of the interaction between Blatstein and Main, Main did not owe Blatstein money (which would indicate that Blatstein had invested heavily in Main to hide his assets in the corporation), he noted that Blatstein owed Main $402,000. Id. Further, he noted that while the corporations paid $269,000 of the Blatsteins’ personal expenses, the Blatsteins paid $360,000 of the corporations’ expenses. Id.
The court also recounted that Blatstein’s expert’s testimony supported upholding the corporate form. The expert testified that the corporate transactions were not made to hinder Blatstein’s creditors, and that “since there were no transfers to the corporations from Blatstein, he could not have technically engaged in any fraudulent conveyance.” Id. Moreover, the expert indicated that the transfers to Blatstein actually benefitted his creditors, and that closely-held corporations often grant interest-free loans to their officers and pay their officers’ expenses as long as these amounts are reflected on their books as compensation. Id. In fact, he testified that it would be unusual for a corporation to charge interest in such a situation. Id. at 92.
Thus, the court concluded, that while some factors weighed in favor of piercing the corporate veils, the lack of evidence of other factors was dispositive. First, the court found “no proof that the various corporations ... were in existence only to benefit [Blatstein’s] private concerns.” Id. at 91. In fact, it appeared that all of the corporations other than Main were financially stable and successful businesses. Id. Second, the court found no proof in the record to support a conclusion that the Blatsteins abused the corporate form for illegitimate purposes. Id. Third, the court found that each corporation adhered to corporate formalities by keeping its own financial records and bank accounts and by recording each loan granted to the Blat-steins. Id. Finally, the court concluded that except for the fraudulent transfers regarding Main, none of the corporations *100 committed any fraudulent acts, nor was there evidence that Blatstein siphoned funds either in or out of them. Id. at 92. Thus, except for the fraudulent transfers of Main, neither Blatstein nor the other corporations worked injustice upon the creditors, and hence equity did not require piercing the corporate veils. Id.
After setting forth the appropriate legal precepts, the district court agreed with the bankruptcy court’s assessment. Blatstein, 226 B.R. at 158-59. The court emphasized that while the corporations paid the Blab-steins’ personal expenses and provided them with interest-free loans, these amounts were recorded in the corporate ledgers and were reported to the IRS as income. Id. at 159. The court also emphasized the fact that “rather than using the corporate entities to shelter funds otherwise available to his creditors, Blatstein was a net debtor to his corporations, owing Main in excess of $400,000.” Id. Therefore, the district court affirmed the bankruptcy court’s refusal to pierce the corporate veils. Id.
We will affirm the district court on this point. Pennsylvania law, applicable here, recognizes a strong presumption against piercing the corporate veil. See Lumax Indus., Inc. v. Aultman, 543 Pa. 38, 669 A.2d 893, 895 (1995). The “classical” piercing of the corporate veil is an equitable remedy whereby a court disregards “the existence of the corporation to make the corporation’s individual principals and their personal assets liable for the debts of the corporation.” In re Schuster, 132 B.R. 604, 607 (Bankr.D.Minn.1991). In those instances, we have stated that the factors weighing in favor of piercing the veil include:
failure to observe corporate formalities, non-payment of dividends, insolvency of the debtor corporation at the time, siphoning of funds of the corporation by the dominant shareholder, non-functioning of other officers or directors, absence of corporate records, and the fact that the corporation is merely a facade for the operations of the dominant stockholder or stockholders.
Kaplan v. First Options of Chicago, Inc., 19 F.3d 1503, 1521 (3d Cir.1994) (internal quotation marks omitted), aff'd, 514 U.S. 938, 115 S.Ct. 1920, 131 L.Ed.2d 985 (1995). We also recognized in Kaplan that courts sometimes consider undercapitalization a relevant factor, and that
[n]ot every disregard of corporate formalities or failure to maintain corporate records justifies piercing the corporate veil. That remedy is available only if it is also shown that a corporation’s affairs and personnel were manipulated to such an extent that it became nothing more than a sham used to disguise the alter ego’s use of its assets for his own benefit in fraud of its creditors. In short, the evidence must show that the corporation’s owners abused the legal separation of a corporation from its owners and used the corporation for illegitimate purposes.

Id.

While a classical piercing renders a shareholder responsible for the actions of the corporation, in a “ ‘reverse’ piercing, assets of the corporate entity are used to satisfy the debts of a corporate insider so that the corporate entity and the individual will be considered one and the same.” In re Mass, 178 B.R. 626, 627 (M.D.Pa.1995). See also In re Schuster, 132 B.R. at 607. It is not surprising that it has been recognized that only “exceptional circumstances” warrant granting this “unusual” remedy. In re Mass, 178 B.R. at 627. Consequently, a court should use its equitable powers to disregard the corporate form only if reverse piercing of the veil “will prevent fraud, illegality, injustice, [or] a contravention of public policy....” In re Mass, 178 B.R. at 629 (internal quotation marks omitted).
The district court in Mass did uphold the bankruptcy court’s decision to reverse pierce the corporate veil of Mountain Cleaners, the debtors’ corporation in that *101 case. 178 B.R. at 631. Borrowing the analysis of Schuster, 132 B.R. 604, the court analyzed the “balance between debt- or’s and creditor’s remedies which the bankruptcy system is intended to serve.” Mass, 178 B.R. at 629. The law imposes this balance whereby the “debtor receives the equitable remedy of discharge and the creditor the remedy of receiving a pro rata share of the value which the [Bankruptcy] Code dictates must be available to creditors after the debtor’s ‘fresh start.’ ” Id. at 629-30.
After applying this balancing test, the Mass court decided that the facts warranted a reverse piercing:
In this case, there was a total failure to observe any corporate formalities by the debtors; there were no directors’ or shareholders’ meetings and no dividends were paid; there are no corporate records; no corporate tax records were maintained; the business premises were not leased to the corporation; and at no time was the dry cleaning business conducted as a corporate entity. At all times the debtors used the proceeds of the business as if they were the assets of the individual debtors themselves.
Id. at 630. In contrast the bankruptcy court in this case simply did not find equivalent factors present.
Furthermore, the Mass court found significant the fact that the debtors had changed a personal business account into a corporate account yet continued using the account for personal expenses after filing the Chapter 11 proceeding. Id. at 628. Indeed, “the debtors maintained no other bank accounts, personal or business, during the bankruptcy case.” Id. In fact, the only corporate actions the debtors had taken were the transfer of their checking account into the corporation’s name and the execution of an equipment lease with a telephone company that lay at the crux of the suit. Id. [8] Accordingly, the court held that “the account at issue served as the exclusive ‘debtor-in-possession’ account” and that “ ‘it was estate funds, not “corporate” funds, that were placed in the account.’ ” Id. at 631.
The situation here is different. Although the Blatsteins did not run their corporations as strictly separate entities, they did uphold the corporate form sufficiently by having the corporations keep separate records and bank accounts, and entering on the books all loans the corporations made to each other and to the shareholders.
Moreover, this case lacks an equitable justification for reverse piercing the corporate veils. Arch Street contends that the limited commingling of funds and payment of personal expenses by the corporations was part of an elaborate plan by which Blatstein was attempting to frustrate his creditors’ collection efforts. Although such an assertion, if true, might provide the equitable justification otherwise absent here, the bankruptcy court found the opposite .to be true. The bankruptcy court found that Blatstein did not hide any of his personal assets in the corporations, nor did he commingle his assets with the corporations’ assets so that separation would be impossible. We find no basis in the record to justify a conclusion that the court’s finding was clearly erroneous. Hence, unlike in Mass, the assets that in this case are corporate assets in form are, in fact, corporate assets and are not part of Blatstein’s bankruptcy estate. Consequently, we uphold the district court’s order affirming the bankruptcy court’s decision to deny Arch Street the remedy of reverse piercing.
IV. CONCLUSION
For the foregoing reasons, we will reverse the portion of the district court’s *102 order affirming the bankruptcy court’s order holding that Blatstein did not fraudulently transfer his income to Lori Blat-stein’s personal bank accounts, and will affirm the portions of the district court’s order affirming the bankruptcy court’s determinations concerning the alleged fraudulent transfers of corporate shares and refusal to reverse pierce the corporate veils of the Blatsteins’ corporations. We will remand the case to the district court for further proceedings consistent with this opinion. The parties will bear their own costs on this appeal.

. We are using the numerical designation of the Main bankruptcy cases as the parties and the bankruptcy court have used them even though we do not refer to all the Main cases.

. These corporations are Delawareco, Inc., Engine 46 Steak House Inc., Reedco, Inc., Waterfront Management Corporation, Columbusco, Inc.,Airbev, Inc., and Pier 53 North, Inc. The bankruptcy court found that all the corporate defendants were Pennsylvania corporations jointly owned by Eric and Lori Blatstein as tenants by the entireties. See Main II, 213 B.R. at 74.

. On remand, the bankruptcy court reconsidered its opinion, yet once again concluded that the transfer of Main's assets was fraudulent. In re Main, 1998 WL 778017, at *14-*16 (Bankr.E.D.Pa. Nov.4, 1998) ("Main V”).

. We do not deal with a situation in which it is claimed that there was a fraudulent transfer of assets to a jointly owned corporation and that that transfer should be set aside. Arch Street repeatedly sets forth that it was the titling of the stock that was the fraudulent transfer. Thus, it states the issue as follows: "Whether the bankruptcy court (and district court) erred in ruling that Blatstein’s titling of the stock of his corporation in the names of Blatstein and Lori Blatstein as tenants by the entireties, while Blatstein was insolvent, were not fraudulent transfers.” Br. at 2. See also br. at 26, 29-30, 47.

. Lambert v. California, 355 U.S. 225, 228, 78 S.Ct. 240, 2 L.Ed.2d 228 (1957) (citation omitted).

. 510 U.S. 135, 149, 114 S.Ct. 655, 126 L.Ed.2d 615 (1994).

. Id. at 144, 114 S.Ct 655.

. See id. at 142, 114 S.Ct. 655.

. 524 U.S. 184, 118 S.Ct. 1939, 141 L.Ed.2d 197 (1998).

. The bankruptcy court also ignored (without explanation) an admission by Lori Blatstein in a pre-trial deposition that “the Arch judgment was a factor” in the Blatsteins’ decision to put Blatstein’s income into her personal accounts. Main II, 213 B.R. at 93-94. This testimony demonstrates that, in addition to avoiding the IRS's tax lien, Blatstein also intended to hinder Arch Street's attempts to collect its judgment, and provides another basis for our conclusion that he possessed the actual intent to defraud his creditors under PUFTA.

. Moreover, according to a long-standing district court case, this burden may be heavier on a grantor’s wife when she is the grantee: "the burden is on the wife to show by clear and satisfactory evidence, beyond that required of other creditors, that at the time of the transfer he was solvent or that she paid full consideration.” Winter v. Welker, 174 F.Supp. 836, 843 (E.D.Pa.1959).

. Arch Street does not press vigorously before us its claim that the corporations were each others' alter egos which is weaker than its claim that they were Blatstein’s alter egos. For this reason, and in light of our rejection of Arch Street's stronger alter ego claim, we will affirm the district court's rejection of it without discussion.

. Basically, Bell Atlantic had leased the corporation some telephone equipment, and was attempting to receive full payment of the lease after the corporation breached its contract. The debtors and the trustee of the bankruptcy estate brought the action to pierce the corporate veil of the cleaning business to bring the corporation's assets into the bankruptcy estate and thus force Bell Atlantic to advance its claim through the estate.