

2008 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

1-29-2008

# In Re: DiLoreto

Precedential or Non-Precedential: Non-Precedential

Docket No. 06-4818

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2008

Recommended Citation

"In Re: DiLoreto " (2008). *2008 Decisions.* Paper 1685.
http://digitalcommons.law.villanova.edu/thirdcircuit_2008/1685

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2008 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

No. 06-4818
_____

IN RE: RICHARD A. DILORETO,

Debtor

GREGORY V. SERIO, Superintendent of
Insurance of the State of New York, and
His Successors in Office as Superintendent
of Insurance of the State of New York, as
Liquidator of Nassau Insurance Company

v.

RICHARD A. DILORETO

SILLS, CUMMIS, ZUCKERMAN, RADIN, TISCHMAN,
EPSTEIN & GROSS; DONOVAN & ASSOCIATES, P.C.,

Intervenors in District Court

TRUSTEE GLORIA M. SATRIALE

Richard A. DiLoreto,

Appellant

_____

On Appeal from United States District Court for the
District of Eastern Pennsylvania
(District Court No. 04-cv-01326)
District Judge: Honorable Bruce W. Kauffman
_____

Submitted Under Third Circuit LAR 34.1(a)
Submitted January 10, 2008

Before: FISHER, HARDIMAN and STAPLETON, *Circuit Judges*.

(Filed: January 29, 2008)

_____

OPINION OF THE COURT
_____

HARDIMAN, *Circuit Judge*.

Debtor Richard A. DiLoreto appeals a final order of the United States District Court for the Eastern District of Pennsylvania denying him a discharge in bankruptcy. DiLoreto argues that the District Court erred in reverse-piercing the veils of various corporations and offshore entities to include their assets in his bankruptcy estate. For the reasons that follow, we will affirm.

I.

As we write for the parties, who are familiar with the procedural history, facts and arguments, we recount only that which is essential to our decision. DiLoreto filed a petition for relief under Chapter 7 of the Bankruptcy Code, submitting a Schedule of

2

Assets and Liabilities and a Statement of Financial Affairs. The Superintendent of Insurance of the State of New York (Superintendent) objected to the discharge, alleging that DiLoreto had omitted assets from his Schedule and Statement that were nominally the property of various corporations and offshore entities but were actually under his control. The Superintendent therefore alleged that DiLoreto violated the Bankruptcy Code by: concealing assets with intent to defraud (11 U.S.C. § 727(a)(2)); failing to produce adequate records from which his financial condition could be ascertained (11 U.S.C. § 727(a)(3)); and breaching his duty of candor to his creditors (11 U.S.C. § 727(a)(4)).

The Bankruptcy Court granted the Superintendent's objections to the discharge, writing a comprehensive and persuasive opinion in support of its decision. Central to the Bankruptcy Court's analysis was its application of federal common law to reverse-pierce the veils of the corporations and offshore entities at issue, thereby determining that their assets should have been included in DiLoreto's bankruptcy estate. Once this determination was made, it essentially followed that DiLoreto was not entitled to a discharge under §§ 727(a)(2)-(4).

DiLoreto argued to the District Court that the Bankruptcy Court erred in applying federal common law, claiming that there would have been no basis to reverse-pierce the corporate veils had the Bankruptcy Court properly applied Pennsylvania law. The District Court rejected this argument and affirmed the Bankruptcy Court, determining that the

result of the reverse-piercing analysis would have been the same under Pennsylvania or federal common law.

## II.

In this appeal, DiLoreto relies heavily on our decision in *In re Blatstein*, 192 F.3d 88 (3d Cir. 1999), in which we declined to reverse-pierce corporate veils under Pennsylvania law. DiLoreto claims that the "facts and issues [here] were in many ways identical to those in Blatstein" and suggests that "had either court employed the Blatstein analysis, [he] would not have been denied his discharge."

Like the Superintendent in the instant case, the plaintiff in *Blatstein* sought reverse-piercing, claiming that the "commingling of funds and payment of personal expenses by the corporations was part of an elaborate plan by [the debtor] to frustrate his creditors' collection efforts." 192 F.3d at 101. Although we noted that "such an assertion, if true, might provide [an] equitable justification" for reverse-piercing, we instead "found the opposite to be true . . . that Blatstein did not hide any of his personal assets in the corporations, nor did he commingle his assets with the corporations' assets so that separation would be impossible." *Id.* Accordingly, we found no factual predicate to reverse-pierce the corporate veils in *Blatstein*.

Unlike in *Blatstein,* the evidence in this case indicates that DiLoreto attempted to conceal assets and beneficial interests from his creditors. For example, while DiLoreto was president of Ardra and the sole owner of Ardra's parent company – and soon after he,

4

his wife, and Ardra received a $16.3 million judgment against them – he made a series of cash transfers totaling $780,117.10 to Ardra's Bermuda accounts in 1994 and 1995. Furthermore, in June 1998 – a mere five months before he filed for bankruptcy – DiLoreto caused Ardra to be sold on non-commercial terms to PTC Finance Limited (PTC). Although PTC was ostensibly unaffiliated with DiLoreto, it was owned by Peter Evans, a Bahamian businessman who had previously assisted DiLoreto with numerous offshore transactions. Furthermore, Evans acquired Ardra for a mere $50,000, and DiLoreto himself admitted that the sale did not take account of Ardra's assets and liabilities.[1] Thus, the Bankruptcy Court concluded that this transaction "allowed Ardra and its assets to be transferred to an offshore company, with no apparent tie to Mr. DiLoreto and his family" but that DiLoreto nevertheless "was aware of and controlled the day-to-day operation of Ardra by virtue of his ongoing business relations with Mr. Evans." (Bkrtcy Op. at 74). The record supports the Bankruptcy Court's conclusion in this regard.

DiLoreto does make a valid point regarding the applicability of *Blatstein*'s distinction between classic piercing and reverse-piercing to some of the transactions at issue. For example, we note that Ardra's various payments to DiLoreto and his family

---

[1] Ardra's exact financial condition at the time of the June 1998 sale is not clear from the record. However, its 1995 balance sheet stated assets of $1,524,276 against liabilities of $786,207. When asked whether Ardra's assets were in excess of half a million dollars at the time of the sale, DiLoreto responded that he did not recall.

5

members would benefit rather than hinder DiLoreto's creditors. Such payments could serve as the basis for classic piercing (in which DiLoreto is held liable to Ardra's creditors for Ardra's debts) as opposed to reverse-piercing (in which Ardra is held liable to DiLoreto's creditors for DiLoreto's debts). If these payments were the only transactions at issue, *Blatstein* suggests that they would be insufficient to support reverse-piercing.

However, in light of the other transactions here – such as the Ardra-PTC sale, DiLoreto's various cash transfers to Ardra, the rapid funneling of funds through various offshore entities, and the unexplained disappearance of more than $3 million from these entities – it is clear that *Blatstein* does not control. Furthermore, though DiLoreto offers benign explanations for these transactions, he does not persuasively contradict the Bankruptcy Court's finding that he "embarked upon a complex plan over many years to control his personal assets and the assets of various entities, which assets and entities were titled in the name of family members or numerous corporations but subject to his complete control." (Bkrtcy Op. at 97).

Because we are convinced that the result would be the same under either federal common law or Pennsylvania law as described in *Blatstein*, we conclude that the Bankruptcy Court and District Court did not err in reverse-piercing the veils of the corporations and offshore entities at issue.

III.

We now turn to the specific bases for the denial of DiLoreto's discharge. Section

727(a)(2) provides that a debtor shall be denied a discharge where he:

> with intent to hinder, delay or defraud a creditor or an officer of the estate
> charged with the custody of property under this title, has transferred,
> removed, destroyed, mutilated or concealed, or has permitted to be
> transferred, removed, destroyed, mutilated or concealed –
>
> (A) property of the debtor, within one year before the date of the filing of
> the petition.

To warrant a denial of discharge under § 727(a)(2), the Superintendent must prove by a

preponderance of the evidence that DiLoreto: (1) transferred or concealed property; (2)

belonging to him; (3) within one year of the bankruptcy filing or after the petition was

filed; and (4) with intent to hinder, delay, or defraud a creditor. *See In re Dawley*, 312

B.R. 765, 782 (Bkrtcy. E.D. Pa. 2004).

Given the various transfers of DiLoreto's personal assets and corporate assets

under his control, and in light of the foregoing reverse-piercing analysis, the District

Court did not err in concluding that the first and second elements were satisfied. With

regard to the third element, we note that the non-commercial sale of Ardra to PTC

occurred five months before DiLoreto filed for bankruptcy. In addition, though several

other transactions (including the series of cash transfers to Ardra) occurred more than a

year before the filing, the District Court properly invoked the continuous concealment

doctrine – which provides that "concealment will be found to exist during the year before

7

bankruptcy even if the initial act of concealment took place before this one-year period as long as the debtor allowed the property to remain concealed into the critical year."[2] *Rosen v. Bezner*, 996 F.2d 1527, 1531 (3d Cir. 1993).

Finally, the fourth element requires proof that DiLoreto acted with the intent to hinder, delay, or defraud his creditors during the year before the bankruptcy filing. *Rosen*, 996 F.2d at 1533. Given the difficulty of demonstrating intent, this proof "may be based on inferences drawn from a course of conduct." *In re Zimmerman*, 320 B.C. 800, 806 (Bkrtcy. M.D. Pa. 2005). Here, DiLoreto's transactions were marked with numerous badges of fraud, including: insider relationships between the parties; DiLoreto's retention of benefits from transferred assets; inadequate consideration for transfers; and the proximity of transactions to judgments against DiLoreto and his affiliates. *See In re Watman*, 301 F.3d 3, 8 (1st Cir. 2002) (*citing Salomon v. Kaiser*, 722 F.2d 1574, 1582-83 (2d Cir. 1983)). We also note that "[t]he shifting of assets by the debtor to a corporation wholly controlled by him is another badge of fraud." *Id.* (*citing Salomon*, 722 F.2d at 1583). Accordingly, the District Court did not err in finding that DiLoreto possessed the

---

[2] We are unpersuaded by DiLoreto's argument that the continuous concealment doctrine does not apply to the 1994 and 1995 cash transfers because "there is no finding that the money continued to exist into the one-year period prior to the bankruptcy" and that he therefore "had no continued beneficial interest in that property." DiLoreto cannot credibly argue that the money he transferred to Ardra's Bermuda accounts in 1994 and 1995 no longer existed as of 1998.

requisite intent to defraud, and that this intent persisted up to and throughout his bankruptcy filing.[3]

## IV.

Sections 727(a)(3) and (4) provide independent bases for the denial of DiLoreto's discharge. In order to state a claim under § 727(a)(3), the Superintendent must demonstrate by a preponderance of the evidence that: (1) DiLoreto concealed or failed to maintain and preserve adequate records, and (2) this failure made it impossible to ascertain his financial condition and material business transactions. *Meridian Bank v. Alten*, 958 F.2d 1226, 1233 (3d Cir. 1992). Once the Superintendent meets his burden of proof, DiLoreto is then required to "justify his failure to maintain the records." *Id.* Here, the Superintendent notes that DiLoreto failed to produce records showing the disposition of more than $3 million that was transferred to offshore entities such as Ardra, Nara, and Sondam. DiLoreto offers no explanation for the absence of the records, or the absence of the $3 million for that matter; instead, he argues that the records are irrelevant because the aforementioned entities were erroneously deemed his alter ego. In light of our decision affirming the reverse-piercing of these entities, DiLoreto's argument fails and we hold that there was no error in denying him a discharge under § 727(a)(3).

---

[3] Indeed, the Bankruptcy Court found that DiLoreto's fraudulent intent persisted through trial when it cited his "selective memory lapses" while testifying as well as his failure to provide adequate explanations for many of the transactions discussed. (Bkrtcy Op. at 89-90).

Finally, under § 727(a)(4)(A), a debtor is not entitled to a discharge when he "knowingly and fraudulently, in or in connection with the case – (A) made a false oath or account." DiLoreto's failure to disclose his assets and beneficial interests in various corporations and offshore entities, as well as his false testimony that the records he submitted were complete, is sufficient evidence to support the denial of his discharge under § 727(a)(4).

V.

For the foregoing reasons, we will affirm the judgment of the District Court.