

2003 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

6-11-2003

# Trustees Natl v. Lutyk

Precedential or Non-Precedential: Precedential

Docket No. 01-2394

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2003

Recommended Citation

"Trustees Natl v. Lutyk" (2003). *2003 Decisions.* Paper 419.
http://digitalcommons.law.villanova.edu/thirdcircuit_2003/419

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2003 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

Filed June 11, 2003

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 01-2394

TRUSTEES OF THE NATIONAL ELEVATOR INDUSTRY
PENSION, HEALTH BENEFIT AND EDUCATIONAL FUNDS

v.

ANDREW LUTYK,
                                        Appellant

Appeal from the United States District Court
for the Eastern District of Pennsylvania
Civil Action No. 00-2301
District Judge: Honorable Marvin Katz

Argued: December 2, 2002

Before: ROTH, SMITH, and CUDAHY,* *Circuit Judges*

(Filed: June 11, 2003)

Frank Breitman, Esq.
Andre C. Dasent, Esq. (argued)
785 Bourse Building, 21 S. 5th St.
Philadelphia, PA 16106

*Attorneys for Appellant*

---

* Honorable Richard D. Cudahy, United States Court of Appeals for the
Seventh Circuit, sitting by designation.

Robert P. Curley, Esq.
Sally M. Tedrow, Esq. (argued)
David D. Capuano, Esq.
O'Donoghue & O'Donoghue
325 Chestnut St., Suite 515
Philadelphia, PA 19106

*Attorneys for Appellee*

## OPINION OF THE COURT

SMITH, *Circuit Judge*:

On this appeal, the sole issue raised by defendant Andrew Lutyk is whether the record of a non-jury trial justified piercing the corporate veil of the American Elevator Company to impose personal liability on him as its sole shareholder for unpaid contributions the corporation owed to health, benefit, and pension funds established by a collective bargaining agreement. Because we believe that the District Court did not base its decision on clearly erroneous factual findings, we will affirm.

### I.

Defendant Andrew Lutyk was the president, sole director, and sole shareholder of the American Elevator Company ("American"), a small, closely-held corporation which performed elevator service and repair. Lutyk incorporated American in late 1992. Pursuant to various agreements between American and the International Union of Elevator Constructors, AFL-CIO, in addition to the regular wages paid to its employees, American was obligated to make monthly contributions to various benefit and pension funds. American was also required to make certain wage deductions from the employees' salaries, then remit those deductions to the pension fund.

The benefit and pension funds — the National Elevator Industry Pension Fund, the National Elevator Industry Health Benefit Fund, and the National Elevator Industry Educational Fund (collectively, the "NEI Funds") — were

created and maintained pursuant to § 302(c)(5) of the Labor Management Relations Act, 29 U.S.C. § 186(c)(5), and administered by a Board of Trustees, the plaintiff in this action. The Pension Fund is an employee pension benefit plan as defined by § 3(2) of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1002(2). The Health Fund and Educational Fund are employee welfare benefit plans as defined in § 3(1) of ERISA, 29 U.S.C. § 1002(1). All the NEI Funds are also multiemployer plans as defined in § 3(37)(A) of ERISA, 29 U.S.C. § 1002(37)(A).

In 1996, American began to experience financial difficulties due to an unrelated lawsuit and misconduct by the company's former controller. While corporate equity nominally included $25,000 in "Common Stock" and $141,000 in "Additional Paid In Capital" at the end of 1995, American's 1996 tax return listed *negative* retained earnings of $373,420, which rose to negative $433,051 by the end of 1996. In short, by at least December 31, 1995, no equity remained in the company. Nonetheless, American was carrying $133,268 in supposed "Loans from shareholders" in 1995. The available corporate records showed that these loans rose to at least $174,881.00 at the end of 1996 and remained there at least until December 31, 1997, but dropped to a mere $24,356.00 by the end of 1998. The District Court found that, beginning at least in 1996 and continuing until American ceased operations in late 1999, the corporation was insolvent.

At this time, American fell behind in meeting its contractual obligations to contribute to the NEI Funds. In 1998, the Board of Trustees sued American to recover these unpaid benefit contributions. That civil action culminated in a consent judgment whereby American agreed to pay the NEI Funds a total of $280,284.60. However, in 1999, American ceased business operations. Although subsequent payments were made to the NEI Funds, American paid only $40,000 pursuant to the consent judgment, along with $2,524.74 that had been deducted from the employees' paychecks after the consent judgment, but not immediately paid to the NEI Funds.

On May 4, 2000, the Board of Trustees initiated the present lawsuit against defendant Lutyk personally,

alleging that he was also liable to the NEI Funds as a fiduciary under § 409 of ERISA, § 29 U.S.C. § 1109(a). Plaintiff sought to recover from Lutyk the full amount of what it had been unable to collect from American, as well as additional contributions accrued but never paid by American after the consent judgment. The District Court denied plaintiff's motion for summary judgment on the ERISA claims, concluding that there were material issues of fact in dispute concerning whether the unpaid contributions to the benefit funds were plan "assets." *Tr. of the Nat'l Elevator Indus. Pension v. Lutyk*, 140 F. Supp. 2d 407, 412 (E.D. Pa. 2001) ("*Lutyk I*"). While reasoning that this potentially prohibited Lutyk from having any direct liability under ERISA, the District Court *sua sponte* read our opinion in *Solomon v. Klein*, 770 F.2d 352 (3d Cir. 1985), to provide that by "piercing the corporate veil," the claims against Lutyk might be sustained. *Lutyk I*, 140 F. Supp. 2d at 412-13. Although also declining to grant summary judgment on that ground, the District Court established piercing the corporate veil as an issue for trial. *Id.* at 413-14.[1]

After a non-jury trial, the District Court concluded that, under the terms of the parties' agreements, the unpaid contributions in this case were not plan "assets" within the meaning of 29 U.S.C. § 1002(21)(A)(i). *Tr. of the Nat'l Elevator Indus. Pension v. Lutyk*, 140 F. Supp. 2d 447, 456 (E.D. Pa. 2001) ("*Lutyk II*"). Therefore, Lutyk was not a "fiduciary" of those funds under § 409 of ERISA, 29 U.S.C. § 1109(a), and was not directly liable for all but $332.54 of the debt that American owed to the NEI Funds.[2] Nonetheless, because the District Court concluded that the circumstances of the case justified piercing the corporate veil of American, the District Court found Lutyk personally

---

1. Though not material to this decision, the District Court also concluded that a three-year statute of limitations barred recovery of some of the debts of American. *See* 140 F. Supp. 2d at 414.

2. The $332.54 stemmed from the liquidated damages and interest associated with the $2,524.74 in previously unremitted employee wage deductions, which the District Court reasoned *were* plan assets. *Lutyk II*, 140 F. Supp. 2d at 456.

liable for the remainder of the $287,627.43 that American then owed the NEI Funds. *Id.* at 460.

The District Court asserted jurisdiction over this case pursuant to 28 U.S.C. § 1331. We have jurisdiction over the appeal pursuant to 28 U.S.C. § 1291.[3] When a district court conducts a non-jury trial, we "review the District Court's findings of facts for clear error. Application of legal precepts to historical facts receives plenary review." *In re Unisys Sav. Plan Litig.*, 173 F.3d 145, 149 (3d Cir. 1999). "It is not for us to pass upon the numerous factual and legal issues as though we were trying the cases [d]e novo. 'It is not enough to reverse the District Court that we might have appraised the facts somewhat differently. If there is warrant for the action of the District Court, our task on review is at an end.'" *Matter of Penn Cent. Transp. Co.*, 596 F.2d 1127, 1140 (3d Cir. 1979) (quoting *Group of Inst'l Inv. v. Chicago, M., St. P. & P. R. Co.*, 318 U.S. 523, 564 (1943)).

---

3. We asked the parties to provide us with supplemental briefing on whether the Supreme Court's decision in *Peacock v. Thomas*, 516 U.S. 349 (1996), impacts on the jurisdiction of the federal courts to adjudicate these claims. We believe that *Peacock* is distinguishable because the "complaint in [that] lawsuit alleged no violation of ERISA or of the plan. The wrongdoing [which justified piercing the corporate veil] alleged in the complaint occurred . . . some four to five years after [the corporation's] ERISA plan was terminated, and [plaintiff] did not — indeed, could not — allege that [defendant] was a fiduciary to the terminated plan." *Id.* at 353. By contrast, the "well-pleaded complaint" in this action asserted claims based on ERISA for both the unremitted employee wage deductions and the unpaid employer contributions. *See Metropolitan Life Ins. Co. v. Taylor*, 481 U.S. 58, 63 (1987) (discussing the "well-pleaded" complaint rule). The District Court below concluded that the unpaid wage deductions were plan "assets." *Lutyk II*, 140 F. Supp. 2d at 456. Thus, Lutyk *was a fiduciary* derivatively liable under federal ERISA law for $332.54. Unlike *Peacock*, where the plaintiff asserted no direct violation of federal law by the defendant, it was based on established ERISA liability *in this suit* that the District Court was able to invoke the further "equitable remedy" of piercing the corporate veil to hold Lutyk liable for the balance of the funds American owed the Trustees. *See In re Blatstein*, 192 F.3d 88, 100 (3d Cir. 1999). Whatever implications *Peacock* has on the statutory authority of district courts to "pierce the corporate veil" in ERISA cases, we are satisfied that the District Court properly invoked federal subject-matter jurisdiction over this dispute.

**II.**

At summary judgment, the District Court *sua sponte* invoked the "alter ego doctrine" and questioned whether, pursuant to *Solomon*, 770 F.2d at 353, it might be appropriate for the plaintiff to fix liability upon Lutyk by piercing the corporate veil. "Piercing the corporate veil is not itself an independent ERISA cause of action, but rather is a means of imposing liability on an underlying cause of action." *Peacock v. Thomas*, 516 U.S. 349, 354 (1996) (quotation omitted); *see also* 1 William Meade Fletcher, *Fletcher Cyclopedia of the Law of Private Corporations* § 41.10 (2002). "The 'classical' piercing of the corporate veil is an equitable remedy whereby a court disregards the existence of the corporation to make the corporation's individual principals and their personal assets liable for the debts of the corporation." *In re Blatstein*, 192 F.3d 88, 100 (3d Cir. 1999) (citation omitted); *see also Bd. of Tr. of Teamsters Local 863 Pension Fund v. Foodtown, Inc.*, 296 F.3d 164, 171 (3d Cir. 2002); *Publicker Indus., Inc. v. Roman Ceramics Corp.*, 603 F.2d 1065, 1069 (3d Cir. 1979). If applicable, the doctrine permits a "charge[ ] [of] derivative . . . liability" against the person or entity controlling the corporation. *United States v. Bestfoods*, 524 U.S. 51, 64 (1998) (noting that piercing the corporate veil gives rise to derivative liability, though direct liability was appropriate on those facts because of the peculiar nature of CERCLA "operator" liability). "Because alter ego is akin to and has elements of fraud theory, we think it too must be shown by clear and convincing evidence." *Kaplan v. First Options of Chicago, Inc.*, 19 F.3d 1503, 1522 (3d Cir. 1994).

In his brief to this Court on appeal, Lutyk's entire summary of argument is as follows:

> The district court erred and abused its discretion in the determination to pierce the corporate veil and impose personal liability under ERISA without sufficient record support.

We read Lutyk to be challenging only the District Court's application of the legal test for piercing the corporate veil set forth in *United States v. Pisani*, 646 F.2d 83, 87-88 (3d Cir. 1981) and the related factual findings. Our review of

the proceedings below indicates that Lutyk made no objection, as he did not raise the issue to us in his briefs, with respect to the District Court's authority to pierce the corporate veil and impose liability on a third-party not directly liable under ERISA.[4] While our reading of the District Court's order indicates that the District Court purported to pierce the corporate veil pursuant to ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2), and we have some doubts regarding the District Court's authority to do so,[5] "[i]t is well established that failure to raise an issue in the district court constitutes a waiver of the argument" in the Court of Appeals. *Brenner v. Local 514, United Bhd. of Carpenters & Joiners of Am.*, 927 F.2d 1283, 1298 (3d Cir. 1991); *see also Medical Protective Co. v. Watkins*, 198 F.3d 100, 105 n.3 (3d Cir. 1999). Likewise, although the District Court did not make a specific finding concerning the amount of funds siphoned from American, Lutyk has similarly conceded that the imposition on him of the full judgment that remained against American of $287,627.43 was appropriate. *See Peacock*, 516 U.S. at 352 (declining to

---

4. In *Solomon*, we held that a corporate shareholder or officer is not an "employer," as that term is defined for purposes of ERISA, *Solomon*, 770 F.2d at 353-54, an interpretation that has achieved nearly universal acceptance in the other federal circuits. *See Antol v. Esposto*, 100 F.3d 1111, 1118 n.2 (3d Cir. 1996) (string-citing cases). While we stated in dictum that "[h]ad [those plaintiffs] proceeded on an alter ego basis our inquiry would be different," we did not state that such a course would have been a means of imposing direct federal liability under ERISA. *Solomon*, 770 F.2d at 353. Because "[w]e did not intend that sentence to dispose of an important issue which we had yet to face head-on," *see*, *e.g.*, *In re FMC Corp. Packaging Sys. Div.*, 208 F.3d 445, 450-51 (3d Cir. 2000), it cannot be said that the dictum of *Solomon* and *Cent. Pa. Teamsters Pension Fund v. McCormick Dray Line, Inc.*, 85 F.3d 1098, 1109 (3d Cir. 1996) settles the question of *direct* ERISA liability against a corporate officer or shareholder through the "alter ego" doctrine.

5. *See Peacock*, 516 U.S. at 354 (noting it is unresolved "if ERISA permits a plaintiff to pierce the corporate veil to reach a defendant not otherwise subject to suit under ERISA"); *see also Mertens v. Hewitt Assoc.*, 508 U.S. 248, 251 (1993) (rejecting that "ERISA authorizes suits for money damages against nonfiduciaries who knowingly participate in a fiduciary's breach of fiduciary duty"). *But see Bd. of Tr., Sheet Metal Workers' Nat'l Pension Fund v. Elite Erectors, Inc.*, 212 F.3d 1031, 1038 (7th Cir. 2000).

address a similar issue).[6] Because the parties did not raise these issues below and Lutyk did not invoke them on appeal, we will assume, without deciding, that these actions of the District Court were proper. We consider here only the specific issue raised in this Court by Lutyk.

## III.

In analyzing the conduct of Lutyk and applying the alter ego doctrine to determine whether it was appropriate to invoke its remedy to pierce the corporate veil, the District Court below reasoned that "[f]ederal law governs liability for a breach of a labor contract between union and employer, including liability based on a theory of corporate veil piercing." *Lutyk II*, 140 F. Supp. 2d at 457 (citing *Am. Bell Inc. v. Fed'n of Tel. Workers of Pa.*, 736 F.2d 879, 886 (3d Cir. 1984)). Therefore, the District Court applied our *Pisani* decision and the factors outlined therein as a matter of federal common law, 646 F.2d at 88, to determine whether it was appropriate to pierce American's corporate veil.

Lutyk does not appeal the application of *Pisani*'s factors or of federal "common law," *per se*. However, he does dispute the District Court's failure to require, as an element for establishing that the "alter ego doctrine" is applicable, that the plaintiff prove that the corporation was intended as a sham or facade to defraud the corporate creditors.

---

6. The alter ego doctrine is a "tool of equity." *Pearson v. Component Tech. Corp.*, 247 F.3d 471, 484 (3d Cir. 2001); *Kaplan*, 19 F.3d at 1521. As "an equitable remedy," *In re Blatstein*, 192 F.3d at 100, piercing the corporate veil is not technically a mechanism for imposing "legal" liability, but for remedying the "fundamental unfairness [that] will result from a failure to disregard the corporate form." *See, generally*, Fletcher, *supra*, § 41.25. "[A]lter ego status is determined by conduct of the parties that is material to the dispute at hand," *Kaplan*, 19 F.3d at 1522; thus, the theory of harm alleged may affect the scope of the remedy that equity demands. The Trustees did not assert that American was, in its entirety, a "sham" or "facade"; nonetheless, full liability for American's debts is appropriate as Lutyk implicitly conceded to siphoning at least $287,627.43 from American. The District Court noted "[t]here [was] no dispute among the parties that if Lutyk were to be found liable . . . , he would be liable for the full amount of the unpaid employer payments." *Lutyk II*, 140 F. Supp. 2d at 452.

Because neither party challenges the application of our alter ego doctrine to this case, we will also assume without deciding that those factors apply, and consider whether "fraudulent intent" is indeed a required element of the analysis. *Cf. United States v. Bestfoods*, 524 U.S. 51, 63 n.9 (1998) (declining to discuss whether the state or federal alter ego doctrine applied to determine derivative liability under CERCLA). In *Pearson v. Component Tech. Corp.*, 247 F.3d 471 (3d Cir. 2001), this Court discussed the factors of the "Third Circuit alter ego test," *id.* at 484, and noted some of the differences between our test, and others. One of the "most important differences across jurisdictions seem[s] to reside largely in . . . whether an element of 'fraudulent intent,' inequitable conduct, or injustice is explicitly required. . ." *Id.* at 484 n.2. Nonetheless, in determining whether to "pierce the corporate veil," we considered

> the following *factors*: gross undercapitalization, failure to observe corporate formalities, nonpayment of dividends, insolvency of debtor corporation, siphoning of funds from the debtor corporation by the dominant stockholder, nonfunctioning of officers and directors, absence of corporate records, and whether the corporation is merely a facade for the operations of the dominant stockholder. *See American Bell*, 736 F.2d at 886.

*Id.* at 484-85 (emphasis added). We have never characterized these "factors" as elements of a rigid test. *See, e.g., American Bell*, 736 F.2d at 886 (these factors are "not the exclusive approach"); *Pisani*, 646 F.2d at 88. What we have done is to essentially inquire "into whether the debtor corporation is little more than a legal fiction." *Pearson*, 247 F.3d at 485. While "piercing of the corporate veil is an equitable remedy," *In re Blatstein*, 192 F.3d at 100, and therefore "the situation must present an element of injustice or fundamental unfairness, . . . a number of these factors can be sufficient to show such unfairness." *Pisani*, 646 F.2d at 88 (quotation omitted); *see also* Fletcher, *supra*, §§ 41.25, 41.32 ("constructive fraud and avoiding an inequitable result is often enough"). Because our test does not require proof of actual fraud as a

prerequisite for piercing the corporate veil, the District Court's failure here to require that the plaintiff prove that American was established as a "facade" was not an error of law.[7]

## IV.

"[A]lter ego . . . must be shown by clear and convincing evidence." *Kaplan*, 19 F.3d at 1522. Nonetheless, "[w]hen findings [of a district court] are based on determinations regarding the credibility of witnesses, Rule 52(a) demands even greater deference to the trial court's findings" by the court of appeals. *Ragan v. Tri-County Excavating, Inc.*, 62 F.3d 501, 507 (3d Cir. 1995). Furthermore, where, as here, the appellant fails to point to specific evidence either in the record or not in the record before the District Court which shows that the Court's findings were made in "clear error," *id.* at 506, we are inclined to affirm the District Court.

The District Court reasoned that factual findings with respect to the following "factors" weighed in favor of piercing the corporate veil: the insolvency of the debtor corporation, American's undercapitalization, the siphoning of American's funds by Lutyk, and the dearth of corporate formalities and corporate records, as well as the element that injustice would occur if Lutyk was not made responsible. *See Pisani*, 646 F.2d at 88 (listing factors). We conclude that, with the exception of the District Court's conclusion regarding American's undercapitalization, the District Court's findings are adequately supported by the record and not clearly erroneous.

The District Court's finding with respect to American's insolvency is well supported by the record. The scant corporate records before the Court demonstrated that corporate equity was negative and that liabilities exceeded corporate assets. Nonetheless, the very purpose of the corporate form is to limit the liability of investors to the

---

7. We note, however, that where the conduct alleged to justify piercing the corporate veil is that the corporation as a whole is a "sham" or "facade," a finding "akin to . . . fraud" is necessary. *See Kaplan*, 19 F.3d at 1521-23.

capital they pay in, *see Zubik v. Zubik*, 384 F.2d 267, 273 (3d Cir. 1967); insolvency, without more, is not a factor which can justify piercing a corporate veil. *See American Bell*, 736 F.2d at 886 (requiring "specific, unusual circumstances"). However, insolvency may raise questions concerning the conduct of corporate officers and shareholders which otherwise would be presumed appropriate, *see* Fletcher, *supra*, § 41.40; here, it causes us to closely scrutinize the actions of Lutyk.

In particular, the District Court's findings with respect to American's insolvency are strong evidence to support the Court's conclusion that Lutyk was siphoning funds. *See Pisani*, 646 F.2d at 88 (affirming piercing of the corporate veil when the shareholder "repaid the [shareholder] loans to himself with corporate funds while the corporation was failing"). The corporate records before the District Court indicated that American owed Lutyk on "loans" of $174,881.00 at the end of 1996 and 1997. Over the next year, as American plunged deeper into insolvency and the corporation failed to pay the contributions it owed the NEI Funds under the collective bargaining agreements, the amount of those "shareholder loans" dropped precipitously to $24,356.00. While Lutyk disputes the fact that those loans were repaid, he points to no evidence in the record indicating that the District Court's finding was clear error. Beyond the "loans" that Lutyk caused American to repay him, American's ledgers also show that Lutyk directly withdrew increasing amounts of cash from the corporation as it declined. The District Court noted that in 1997, Lutyk apparently took from the corporation $28,100 through so-called "partner's drawings." Those drawings increased to $35,913 in 1998. Then, in the first three months of 1999 *alone*, Lutyk took from the company a further $38,688 in that manner.

Of course, not "every payment to a stockholder during insolvency would justify piercing the corporate veil," *Kaplan*, 19 F.3d at 1522, and some portion of those payments may have been legitimate given the finding that American paid its President no salary. However, these irregularly scheduled, erratic, but not insignificant "drawings" underscore the District Court's findings and

conclusions on two other factors relevant to piercing the corporate veil: Lutyk's substantial disregard of corporate formalities in his management and ownership of American and a significant commingling by Lutyk of American's assets with his own. The District Court noted that it received from Lutyk few of American's tax returns, accounting ledgers, receipts, or other documents which are commonly maintained by an ordinary corporation in its operations. While Lutyk asserts that the lack of formal documentation was due to a storage facility being flooded, the District Judge who heard the witnesses testify did not credit this assertion, and nothing was provided by Lutyk to corroborate his testimony on this alleged flood.

Beyond the "partner's drawings," Lutyk seemed to freely take funds from the company accounts as he saw fit and when he saw fit. That American paid its "President" no salary, while cutting against siphoning, indicates a lack of respect for the corporate form and of American as a separate entity. Evidence before the District Court also indicated that American employed members of Lutyk's family for substantially inflated compensation. His daughter, originally hired by American as an office manager for five dollars an hour during the first five to six years of American's existence, saw her compensation grow to fifteen, then twenty, dollars an hour by the end of American's operations. At the same time, his wife was suddenly added to American's payroll in 1998 at fifteen dollars an hour, though she had no prior work experience. Other evidence demonstrated that corporate funds were used to pay entertainment expenses for Lutyk and his daughter, though the vast majority of these expenses were without a description or identifiable business purpose. The few travel and entertainment expenses that were documented included yacht and golf club fees, though Lutyk admitted he scarcely brought corporate clients to these clubs and paid these fees personally for many years prior to the incorporation of American.

Perhaps as important as what the District Court did consider was what it properly did *not* consider. *See Pearson*, 247 F.3d at 495 (factors need be "relevant"); *In re Blatstein*, 192 F.3d at 100 (same); *Pisani*, 646 F.2d at 88

(same); *see also Kaplan*, 19 F.3d at 1522 ("alter ego status is determined by conduct of the parties that is material to the dispute at hand"). In piercing the corporate veil, the District Court did not afford any weight to either American's failure to pay dividends or the non-functionality of the corporation's officers, other directors, and shareholders. Ordinarily, findings on those two factors would weigh in favor of applying the alter ego doctrine. *See, e.g.*, *Pisani*, 646 F.2d at 88 (listing factors). Nonetheless, such failures by a closely-held corporation such as American are not unusual, and not a strong factor in favor of piercing the corporate veil of such a company. *See* 18 Am. Jur. 2d *Corporations* § 48 (2002) ("lack of formalities in a closely-held or family corporation does not often have as much consequence as where other kinds of corporations are involved"). Furthermore, many jurisdictions actually hold that the payment of dividends at a time when a corporation is insolvent *favors* piercing the corporate veil. *See, e.g., Bd. of Tr. of Teamsters Local 863 Pension Fund v. Foodtown, Inc.*, 296 F.3d 164, 173 (3d Cir. 2002) (discussing New Jersey law).

Nonetheless, we believe that the District Court erred in concluding that American was "grossly undercapitalized for purposes of its corporate undertaking," *Lutyk II*, 140 F. Supp. 2d at 458, and, on these facts, inappropriately gave that finding significant weight. It appears that the District Court conflated an inquiry into American's supposed "undercapitalization" with its earlier inquiry into American's insolvency. Though there is substantial overlap between these concepts, and they are often confused, as a matter of corporate law, mere insolvency is distinct from undercapitalization. *See, generally*, Fletcher, *supra*, § 41.33 (a "corporation that was adequately capitalized when formed, but which subsequently suffers financial reverses is not undercapitalized").

Preliminarily, we view this inquiry as having little relevancy to determining whether piercing the corporate veil was justified here. The alter ego doctrine is not applied by a test, but by consideration of relevant "factors . . . [to determine] whether the debtor corporation is little more than a legal fiction." *See Pearson*, 247 F.3d at 484-85. A

shortage of capital, as with all the factors of the alter ego doctrine, is not *per se* a reason to pierce the corporate veil. *See* 18 Am. Jur. 2d, *supra*, § 49. Companies commonly become insolvent, then bankrupt; piercing the corporate veil is an exception reserved for extreme situations, rather than the rule. *See American Bell*, 736 F.2d at 886 (piercing the corporate veil has "demanding" requirements to be applied only in "specific, unusual circumstances"). Rather, the inquiry into corporate capitalization is most relevant for the inference it provides into whether the corporation was established to defraud its creditors or other improper purpose such as avoiding the risks known to be attendant to a type of business. *See* Fletcher, *supra*, § 41.33; 18 Am. Jur. 2d, *supra*, § 49. No such accusations appear in this record.

Assuming that American's capitalization "for the purposes of the corporate undertaking" was relevant, *Lutyk II*, 140 F. Supp. 2d at 458, in conducting such an inquiry courts generally "look to initial capitalization, asking whether a company was adequately capitalized at the time of its organization." *Matter of Multiponics, Inc.*, 622 F.2d 709, 717 (5th Cir. 1980); *see also* Fletcher, *supra*, § 41.33. "Necessarily, this inquiry is highly factual and may vary substantially with the industry, company, size of the debt, account methods employed, and like factors. The primary inquiry of this Court is to ask whether, under the circumstances, reasonably prudent [individuals] with general business background would deem the company undercapitalized." *Multiponics*, 622 F.2d at 717.

In "the application of the alter ego theory to pierce the corporate veil . . . [t]he burden of proof on this issue rests with the party attempting to negate the existence of a separate entity." *See Publicker Indus., Inc. v. Roman Ceramics Corp.*, 603 F.2d 1065, 1069 (3d Cir. 1979). Nonetheless, the record below is devoid of any evidence or finding as to the level of capital required for a corporation of American's size to conduct elevator service, maintenance, and repair. For a small, closely-held corporation such as American, the $166,000 in initial capitalization may well have been sufficient for that corporate undertaking under normal operating conditions.

The District Court found that capitalization in American was limited to the $25,000 paid in for the common stock, stating that "no evidence was presented to support or explain the significance of the[ ] line items" listing $141,000 in "additional paid-in capital." We are unclear as to why any explanation was required, considering that term's conventional use in the accounting profession. There is no evidence in the record contradicting the company balance sheets and tax returns, which show an additional $141,000 in capital *was* paid in. Supp. App. 85. Lutyk also testified that his capital contribution to American was greater than the $25,000 for the common stock, an assertion that was not contradicted by any other witness. In concluding that American was undercapitalized for its corporate purpose, the District Court relied solely on its insolvency and the ratio of American's capital stock to its shareholder loans as of December 31, 1995 and thereafter.

Further complicating the inquiry into capitalization is the District Court's finding that American's "financial woes were due to the costs of an unrelated lawsuit and misconduct by a prior controller," not underinvestment, mismanagement, or other negligence by Lutyk. *Lutyk II*, 140 F. Supp. 2d at 453. Over that period of financial difficulty, Lutyk's shareholder loans of $95,768.00 nearly doubled to $174,881.00 to keep American from failing. We believe that

> [u]nder such circumstances, loans . . . cannot be sufficient to satisfy this prong, particularly in this context where . . . [Lutyk] was instead by this point conducting a "rescue" operation in an attempt to "return the Company to profitability[.]" We surely do not want to discourage [shareholders of closely held corporations] from attempting to keep their . . . operations afloat with temporary loans by holding that the mere fact that loans were even necessary establishes . . . liability.

*Pearson*, 247 F.3d at 503; *see also Carpenters Health and Welfare Fund of Philadelphia and Vicinity by Gray v. Kenneth R. Ambrose, Inc.*, 727 F.2d 279, 284 (3d Cir. 1983), *abrogation on other grounds recognized by Antol v. Esposto*, 100 F.3d 1111, 1119 (3d Cir. 1996). While American's

December 31, 1995 ratio of loans to equity was not irrelevant for proving American was undercapitalized for its "purposes" in 1992, *Multiponics*, 622 F.2d at 717 ("evidence of inadequate subsequent capitalization [insolvency] may be indicative of initial undercapitalization"), its usefulness was severely limited by the finding that American's financial trouble stemmed from exceptional events that occurred after incorporation. Because evidence justifying piercing the corporate veil must be "clear and convincing," *Kaplan*, 19 F.3d at 1522, that, without more, was insufficient.

Although we reject the District Court's conclusion that American was "undercapitalized," as that term is relevant to the alter ego doctrine, we emphasize that the finding regarding American's substantial *insolvency* during the final years of its operations adds great support to the Court's conclusion regarding the siphoning of funds. *Cf. Crane v. Green & Freedman Baking Co.*, 134 F.3d 17, 23 (1st Cir. 1998) ("wrongful diversion of corporate assets to or for controlling individuals at a time when the corporation is in financial distress . . . can justify piercing the corporate veil"). Although " 'rescue' operation[s]" by the shareholders of a closely held corporation do not ordinarily justify piercing the corporate veil, *see Pearson*, 247 F.3d at 503, once Lutyk apparently became convinced that the "ship" was indeed lost in December 1998, that insolvency makes American's paying off of the "shareholder loans" to Lutyk, to the detriment of other creditors, highly suspect. *See Pisani*, 646 F.2d at 88; *Multiponics*, 622 F.2d at 718 ("proof of subsequent undercapitalization [insolvency] may be further proof of inequitable conduct, such as actions of gross mismanagement, self interest, and the like").

Thus, we believe that the evidence in the record supports both the District Court's conclusion that "the situation . . . present[s] an element of injustice or fundamental unfairness" and its decision to pierce the corporate veil. *Pisani*, 646 F.2d at 88. While American spiraled deeper into debt and failed to make its employee benefit payments to the NEI funds, Lutyk was able to withdraw a significant portion of the money he had "loaned" to the endeavor. Simultaneously, Lutyk *increased* the level of funds he personally withdrew from the corporation and that

American paid to his immediate family. Yet American's obligations to its creditors grew; and those employees of American who were not members of the controlling shareholder's family saw a significant portion of their compensation go unpaid. The "fundamental unfairness" of this situation is patent. *Id.*

## V.

In sum, we are not persuaded that the District Court was "without sufficient record support" to pierce the corporate veil. With the exception of the District Court's conclusion regarding undercapitalization, the evidence from the trial adequately supports the District Court's findings, and it properly applied those findings in determining that piercing the corporate veil was appropriate. Of those findings, most egregious was Lutyk's siphoning of funds over the final months of American's operations while the company was known to be deeply insolvent, though the record is replete with other evidence of abuse of the corporate form. Although Lutyk may have initially founded American as a bona fide corporation for conducting elevator work, his conduct in the management of that company, particularly over the final years of the company's operations, is clear and convincing evidence of sufficient abuse of the corporate form for his personal benefit so as to justify the equitable remedy of piercing the corporate veil. The judgment of the District Court will be affirmed.

A True Copy:
      Teste:

*Clerk of the United States Court of Appeals*
*for the Third Circuit*