2015 UT App 6

**The LODGES AT BEAR HOLLOW CONDOMINIUM HOMEOWNERS ASSOCIATION, INC., Plaintiff and Appellant,**

v.

**BEAR HOLLOW RESTORATION, LLC**
and Hamlet Homes Corporation,
Defendants and Appellees.

Nos. 20130559–CA, 20130718–CA.

Court of Appeals of Utah.

Jan. 2, 2015.

A. Richard Vial, Edward W. McBride Jr., Peter H. Harrison, and Douglas C. Shumway, Salt Lake City, for Appellant.

Russell C. Fericks, Zachary E. Peterson, and Kallie A. Smith, Salt Lake City, for Appellees.

Judge J. FREDERIC VOROS JR. authored this Opinion, in which Judges STEPHEN L. ROTH and MICHELE M. CHRISTIANSEN concurred.

## Opinion

VOROS, Judge:

¶ 1 The Lodges at Bear Hollow condominium complex sits just south of Kimball Junction at the foot of the Olympic ski jump. Citing alleged construction defects, the homeowners association sued the developer, the general contractor, and others. After discovery, the district court denied the homeowners association's requested equitable relief and granted partial summary judgment in favor of the general contractor. We affirm both orders.

## BACKGROUND

¶ 2 With three buildings and a total of ninety-seven stacked condominium units, The Lodges at Bear Hollow (the Lodges) comprises one phase of Bear Hollow Village. To create this master-planned community, Bear Hollow Restoration, LLC (Bear Hollow) was formed with twenty-six members contributing a total of $1,245 million. Bear Hollow then borrowed more than $25 million to construct the Lodges. Hamlet Homes Corporation owned a majority interest in Bear Hollow at all relevant times. To construct the Lodges, Bear Hollow hired Hamlet Homes to act as Bear Hollow's manager and to supervise construction and sale of the condominium units within the Bear Hollow Village.

¶ 3 When construction on the Lodges began, Bear Hollow recorded the "Declaration of Condominium for the Lodges at Bear Hollow" (the Declaration). The Declaration created the Lodges' homeowners association (the Association). Under the terms of the Declaration, the Association was "responsible to maintain, repair, and replace all of the common areas and facilities within or serving the [Lodges]." For about two years, from when Bear Hollow formed the Association until 75% of the condominiums were sold, Bear Hollow controlled the Association pursuant to the Declaration. After condominium-unit sales reached 75%, Bear Hollow ceded control of the Association to the individual condominium owners.

¶ 4 In the spring of 2011, the Association notified Bear Hollow and Hamlet Homes that it had discovered "construction and design problems" in the Lodges' common areas. Later that year, the Association sued Bear Hollow, Hamlet Homes (collectively Defendants), and other parties not relevant to this appeal. In part, the Association brought contract claims against Bear Hollow and—under an alter-ego theory—against Hamlet Homes. Specifically, the Association claimed that Bear Hollow and its alter ego, Hamlet Homes, had breached the contractual duties they owed to the Association.

¶ 5 After discovery, the Association filed a motion to impose a constructive trust based on both Bear Hollow's and Hamlet Homes' construction-defect claims against the subcontractors. However, the district court denied the motion.

¶ 6 Later, Defendants moved for partial summary judgment. The district court

granted Defendants' motion in part. The district court allowed the Association to pursue its contract claims against Bear Hollow but dismissed the Association's contract claims against Hamlet Homes. The court ruled that the Association enjoys privity of contract with Bear Hollow only and that the Association had failed to show that Hamlet Homes is an alter ego of Bear Hollow.

¶ 7 The district court later certified the denial of the Association's motion to establish a constructive trust and the grant of Defendants' motion for partial summary judgment as final and appealable under rule 54(b) of the Utah Rules of Civil Procedure. These appeals followed.[1]

## ISSUES ON APPEAL

¶ 8 First, the Association contends that the district court erred in ruling that Hamlet Homes is not Bear Hollow's alter ego.

¶ 9 Second, the Association contends that the district court abused its discretion in denying the Association's request for a constructive trust, a writ of replevin, and a writ of attachment.[2]

## ANALYSIS

I. The District Court Properly Ruled That the Association Did Not Establish Its Alter–Ego Theory.

¶ 10 The Association first contends that the district court erred in ruling that it could not pursue its contract claims against Hamlet Homes. The Association brought these contract claims against Bear Hollow and Hamlet Homes.[3] The claims against Bear Hollow are well pleaded and will proceed toward trial. However, the district court ruled that because the Association lacks privity of contract with Hamlet Homes and because Hamlet Homes is not Bear Hollow's alter ego, the Association could not pursue its contract claims against Hamlet Homes.

¶ 11 The Association acknowledges that it lacks privity of contract with Hamlet Homes. However, the Association contends that it can pursue its contract claims against Hamlet Homes as an alter ego of Bear Hollow. The Association argues that, at the very least, it provided sufficient evidence to create a genuine issue of material fact as to whether Hamlet Homes and Bear Hollow are alter egos.

¶ 12 A district court properly grants summary judgment where "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Utah R. Civ. P. 56(c). "To survive a motion for summary judgment on an alter ego theory, the party alleging alter ego liability must present evidence creating a genuine issue of disputed material fact with respect to both elements of the *Norman* alter ego test." *Jones & Trevor Mktg., Inc. v. Lowry*, 2012 UT 39, ¶ 25, 284 P.3d 630.[4] We review a district court's legal conclusions and ultimate grant or denial of summary judgment for correctness. *Orvis v. Johnson*, 2008 UT 2, ¶ 6, 177 P.3d 600.

¶ 13 "Ordinarily a corporation is regarded as a legal entity, separate and apart from its stockholders." *Lowry*, 2012 UT 39, ¶ 13, 284 P.3d 630 (citation and internal quo-

---

1. For purposes of judicial economy and because the appeals share factual backgrounds, we address both the appeal from the district court's denial of the motion to establish a constructive trust, number 20130718–CA, and the appeal from the district court's grant of partial summary judgment, number 20130559–CA, in this opinion.

2. Originally, the Association brought a third claim on appeal: that the trial court erred in granting summary judgment on the Association's claims of breach of fiduciary duty against individuals appointed to the Association's board of directors during the time Bear Hollow controlled the Association. This claim on appeal was not directed against Hamlet Homes. After oral argument, the parties stipulated to dismissing all claims against the individual defendants. Accordingly, the Association has abandoned its breach-of-fiduciary-duty claim on appeal, and we do not address it.

3. The Association also brought these claims against Michael Brodsky, but during the pendency of this appeal, the Association dismissed its claims against all individual defendants. Thus, we do not address them.

4. As discussed below, our supreme court created a two-part alter-ego test in *Norman v. Murray First Thrift & Loan Co.*, 596 P.2d 1028, 1030 (Utah 1979).

tation marks omitted). "The purpose of such separation is to insulate the stockholders from the liabilities of the corporation, thus limiting their liability to only the amount that the stockholders voluntarily put at risk." *Id.* (citation and internal quotation marks omitted). The alter-ego doctrine is an exception to this general rule: "If a party can prove its alter ego theory, then that party may 'pierce the corporate veil' and obtain a judgment against the individual shareholders even when the original cause of action arose from a dispute with the corporate entity." *Id.* But courts "will only reluctantly and cautiously pierce the corporate veil." *Salt Lake City Corp. v. James Constructors, Inc.,* 761 P.2d 42, 46 (Utah Ct.App.1988).

¶ 14 Utah courts have adopted a two-part test, known as the *Norman* test, "to determine when a party may pierce the corporate veil." *Lowry,* 2012 UT 39, ¶ 14, 284 P.3d 630; *see also Norman v. Murray First Thrift & Loan Co.,* 596 P.2d 1028, 1030 (Utah 1979). The first part of the test, often called the "formalities requirement," requires the movant to show "such unity of interest and ownership that the separate personalities of the corporation and the individual no longer exist." *Norman,* 596 P.2d at 1030; *see also Messick v. PHD Trucking Serv., Inc.,* 678 P.2d 791, 794 (Utah 1984). The second part of the test, often called the "fairness requirement," requires the movant to show that observance of the corporate form would sanction a fraud, promote injustice, or condone an inequitable result. *Norman,* 596 P.2d at 1030. Whereas the fairness requirement is "addressed to the conscience of the court," *Messick,* 678 P.2d at 794, the formalities requirement is determined by examining seven factors (the *Colman* factors):

(1) undercapitalization of a one-[person] corporation; (2) failure to observe corporate formalities; (3) nonpayment of dividends; (4) siphoning of corporate funds by the dominant stockholder; (5) nonfunctioning of other officers or directors; (6) absence of corporate records; [and] (7) the

use of the corporation as a facade for operations of the dominant stockholder or stockholders. . . .

*Colman v. Colman,* 743 P.2d 782, 786 (Utah Ct.App.1987) (footnotes omitted). The Utah Supreme Court adopted the *Colman* factors "as useful considerations to aid courts in determining whether to pierce the corporate veil," nevertheless emphasizing that "they are merely helpful tools and not required elements." *Lowry,* 2012 UT 39, ¶ 18, 284 P.3d 630. Indeed, "it is possible that evidence of even one of the *Colman* factors may be sufficient to suggest both elements of a party's alter ego theory and therefore preclude summary judgment." *Id.* ¶ 24. Accordingly, "courts should evaluate the entire relationship between a corporation and its officers in determining whether to pierce the corporate veil." *Id.* ¶ 35.[5]

¶ 15 Here, the district court properly concluded that the Association failed to raise a factual issue as to whether Hamlet Homes and Bear Hollow are alter egos. First, the Association did not demonstrate a factual issue with respect to the first part of the *Norman* test: the Association did not demonstrate "such unity of interest and ownership that the separate personalities of the [Bear Hollow] and [Hamlet Homes] no longer exist." *See Norman,* 596 P.2d at 1030.

¶ 16 In support of its claim of such a unity of interest, the Association asserts that Bear Hollow was undercapitalized. "Assessing whether a corporation is adequately capitalized is delicate business." *Laborers' Pension Fund v. Lay–Com, Inc.,* 580 F.3d 602, 612 (7th Cir.2009). "It is coming to be recognized as the policy of the law that shareholders should in good faith put at the risk of the business unencumbered capital reasonably adequate for its prospective liabilities." *James Constructors,* 761 P.2d at 47 n. 10 (citation and internal quotation marks omitted). "If the capital is illusory or trifling compared with the business to be done and the risks of loss, this is a ground for denying

**5.** The parties assume that the alter-ego doctrine applies to limited liability companies as well as corporations. This appears to be the law in Utah. *See d'Elia v. Rice Dev., Inc.,* 2006 UT App 416, ¶¶ 30–34, 147 P.3d 515 (affirming the trial court's refusal to pierce the "corporate" veil of an LLC).

the separate entity privilege." *Id.* (citation and internal quotation marks omitted).

¶ 17 "To determine whether a corporation is adequately capitalized, one must compare the amount of capital to the amount of business to be conducted and obligations to be fulfilled. Absent adequate capitalization, a corporation becomes a mere liability shield, rather than an independent entity capable of carrying on its own business." *Fiumetto v. Garrett Enters., Inc.*, 321 Ill. App.3d 946, 255 Ill.Dec. 510, 749 N.E.2d 992, 1005 (2001). Accordingly, some courts have taken the view that where the party alleging alter ego has "failed to establish what an adequate level of capitalization would be," its evidence on undercapitalization is "insufficient to create an issue for the jury." *Lowell Staats Mining Co. v. Pioneer Uravan, Inc.*, 878 F.2d 1259, 1263 (10th Cir.1989); *see also J–R Grain Co. v. FAC, Inc.*, 627 F.2d 129, 134–35 (8th Cir.1980). Other authorities state that " '[a] corporation that was adequately capitalized when formed, but which subsequently suffers financial reverses is not undercapitalized.' " *Community Care Ctrs., Inc. v. Hamilton*, 774 N.E.2d 559, 565 (Ind. Ct.App.2002) (quoting 1 William Meade Fletcher, *Fletcher Cyclopedia of the Law of Private Corporations* § 41.33 (1999)); *see also Trustees of Nat. Elevator Indus. Pension, Health Benefit & Educ. Funds v. Lutyk*, 332 F.3d 188, 196–97 (3d Cir.2003).

¶ 18 Here, the undisputed evidence showed that Bear Hollow's twenty-six members contributed $1.245 million in start-up capital and that the company was able to borrow (with personal guarantees from at least some of the principals) another $25 million for this project. The Association has not shown why this level of capitalization falls so short of adequate capitalization as to undermine Bear Hollow's separate identity.

¶ 19 The Association argues that Hamlet Homes and the other investors "never provided evidence that the money left in [Bear Hollow] was sufficient to meet all of its obligations, but rather only stated that it was sufficient to meet its bank debt requirements," "never showed that they provided any reserves for likely contingencies," and "never provided any evidence that they pur-chased insurance in a reasonable amount to cover foreseeable and common warranty and construction defect issues."

¶ 20 This argument misperceives the parties' burdens on summary judgment. Because the Association bears the burden of proving its alter-ego theory at trial, it also bears the burden of demonstrating the requisite unity of interest. *See Jones & Trevor Mktg., Inc. v. Lowry*, 2012 UT 39, ¶ 31, 284 P.3d 630. "Where, as here, the nonmoving party will bear the burden of proving the underlying legal theory at trial, the moving party may satisfy its initial burden on summary judgment by showing that the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits," show that "there is no genuine issue of material fact." *Id.* ¶ 30 (citation and internal quotation marks omitted). "Upon such a showing, whether or not supported by additional affirmative factual evidence, the burden then shifts to the nonmoving party, who may not rest upon the mere allegations or denials of the pleadings, but must set forth specific facts showing that there is a genuine issue for trial." *Id.* (emphasis, citation, and internal quotation marks omitted) Where, as here, the moving party has "affirmatively provide[d] factual evidence establishing that there is no genuine issue of material fact," *Orvis v. Johnson*, 2008 UT 2, ¶ 16, 177 P.3d 600, the nonmoving party must set forth specific facts showing a genuine issue for trial, not merely rest on a catalog of what the moving party has not shown.

¶ 21 As evidence of undercapitalization, the Association alleges that, "due to its lack of funding, [Bear Hollow] was unable to pay for the construction defect warranty obligations on the Project and the resultant litigation of this case." However, the possibility that a plaintiff "may have difficulty enforcing a judgment against [the corporate entity] alone is not the type of injustice that warrants piercing the corporate veil." *Lowell*, 878 F.2d at 1265; *see also Seater Constr. Co. v. Deka Invs., LLC*, 2013 IL App (2d) 121140–U, ¶ 46, 2013 WL 3272487 (holding that where the plaintiff "offered no testimony at trial regarding what would have been an

adequate level of capitalization," to conclude that the corporation was undercapitalized "would be speculating").

¶ 22 The Association also asserts that Hamlet Homes received distributions of over $4.5 million that rendered Bear Hollow insolvent and that Bear Hollow "made loans to other companies" that "further contributed to [Bear Hollow's] insolvency." But the Association points to no evidence of actual insolvency. While a deponent did testify that the initial investors did not get their equity back and that Bear Hollow might have had difficulty repaying the $25 million in loans, the Association offered no evidence that Bear Hollow ever defaulted on any obligation. Nor has the Association established that a company's difficulty in meeting its financial obligations demonstrates that it was undercapitalized. A company may have trouble meeting its financial obligations for reasons other than undercapitalization, as that term is used in this context.

¶ 23 In addition, the Association again points to the undisputed evidence that "Hamlet Homes received distributions of over $4.5 million" and alleges that this distribution demonstrates "siphoning of corporate funds by the dominant stockholder." *Colman v. Colman*, 743 P.2d 782, 786 (Utah Ct.App. 1987). But the Association provides no evidence that these distributions were inappropriate under the circumstances at the time.

¶ 24 Next, the Association points out that Hamlet Homes' logo appeared on many Bear Hollow documents, including the contracts of sale to the owners, the Homeowners Reference Manual, and the Warranty Manual. The Association does not tie this fact to any *Colman* factor. Rather, the Association argues that because Hamlet Homes' logo appears on Bear Hollow's documents, a buyer may "believe that Hamlet Homes was the only other party involved in the transaction." But the Association also admits that the sales contract between the purchaser and Bear Hollow clearly identifies Bear Hollow as the seller. And again, Hamlet Homes served as the general contractor, principally constructing the homes, which provides a legitimate reason for Hamlet Homes' logo appearing on Bear Hollow's documents for the homes.

¶ 25 The Association also points out that Hamlet Homes owned a majority interest in Bear Hollow and served as its manager, that the two entities employed some of the same individuals, that subcontractors were paid from Bear Hollow's account by Hamlet Homes' accounting staff, that Bear Hollow made loans to "other companies," and that Bear Hollow paid two rather small invoices for Hamlet Homes. But these facts fall short of showing that the separate personalities of the two entities "no longer exist," *Norman v. Murray First Thrift & Loan Co.*, 596 P.2d 1028, 1030 (Utah 1979), especially in light of undisputed evidence that Bear Hollow and Hamlet Homes were distinct entities with separate organizational documents, separate ownership, separate bank accounts, separate tax returns, and separate books and records. On this record, we agree with the district court that the Association "simply has not demonstrated that there are any genuine issues of material fact in dispute regarding these formalities."

¶ 26 Finally, the Association has also failed to demonstrate that the district court erred with respect to the second part of the *Norman* test: that observance of the corporate form would sanction a fraud, promote injustice, or condone an inequitable result. *See id.* On appeal, the Association's argument on this point appears in a single sentence: "Finally, the Association demonstrated that it would be patently inequitable to allow [Bear Hollow] and Hamlet Homes to stand as separate entities, thus satisfying the second prong of the alter ego test." This sentence "merely restates the [legal] standard and provides no analysis regarding why it would be the case." *See Menzies v. State*, 2014 UT 40, ¶ 152.

¶ 27 In the end, the Association has failed to show "such unity of interest and ownership that the separate personalities of the corporation and the individual no longer exist," and that "observance of the corporate form would sanction a fraud, promote injustice, or an inequitable result would follow." *Norman*, 596 P.2d at 1030. Consequently, the district court correctly determined that the Association did not demonstrate a genuine issue of fact material to its claim that

Hamlet Homes and Bear Hollow are alter egos. Accordingly, the district court properly dismissed the Association's contract claims against Hamlet Homes.

## II. The District Court Did Not Abuse Its Discretion in Denying the Association's Request for Equitable Relief.

¶ 28 The Association contends that the district court abused its discretion in denying its request for equitable relief. First, the Association argues that the district court abused its discretion by refusing to impose a constructive trust on Hamlet Homes' and Bear Hollow's claims against subcontractors on the project. Second, the Association argues that the district court abused its discretion by denying a writ of replevin, or in the alternative, a writ of attachment, seizing Hamlet Homes' and Bear Hollow's claims against those subcontractors. "[A] trial court is accorded considerable latitude and discretion in applying and formulating an equitable remedy, and [it] will not be overturned unless it [has] abused its discretion." *Ockey v. Lehmer*, 2008 UT 37, ¶ 42, 189 P.3d 51 (alterations in original) (citation and internal quotation marks omitted).

## A. The District Court Did Not Abuse Its Discretion in Refusing to Impose a Constructive Trust.

¶ 29 The Association first contends that the district court "abused its discretion in denying [the Association's] motion to establish a constructive trust" that would "allow the Association to press claims which belong to" Defendants against subcontractors that worked on the Lodges. The Association reasons that this court "should impose a constructive trust" over both Bear Hollow's and Hamlet Homes' third-party claims, because without a constructive trust Bear Hollow and Hamlet Homes could shield the subcontractors from liability for substandard work. The Association further argues that because "a court may impose a constructive trust where a fiduciary duty exists," it should do so here.

¶ 30 Defendants respond that the district court did not abuse its discretion in denying the Association's motion to establish a constructive trust. Defendants argue that the Association's policy argument "is insufficient to show that the district court abused its discretion." Defendants further reason that the Association does not meet the test for a constructive trust.

¶ 31 A constructive trust "arises by operation of law to prevent unjust enrichment." *Ashton v. Ashton*, 733 P.2d 147, 150 (Utah 1987). "Courts recognize a constructive trust as a matter of equity" where the moving party meets three requirements. *Wilcox v. Anchor Wate Co.*, 2007 UT 39, ¶ 34, 164 P.3d 353. First, the moving party must show a wrongful act. *Id.* To establish a wrongful act, the moving party must show that "an entity must have obviously received funds by mistake or participated in active or egregious misconduct." *Id.* ¶ 35. Second, the moving party must show "unjust enrichment." *Id.* ¶ 34. Unjust enrichment occurs when the moving party has an "equitable interest" in the property it seeks a constructive trust over. *Parks v. Zions First Nat'l Bank*, 673 P.2d 590, 600 (Utah 1983). Third, the moving party must show that specific property "can be traced to the wrongful behavior." *Wilcox*, 2007 UT 39, ¶ 34, 164 P.3d 353. Finally, constructive trusts "are usually imposed where injustice would result if a party were able to keep money or property that rightfully belonged to another." *Id.*

¶ 32 Here, the Association has not demonstrated that the district court abused its discretion in refusing to impose a constructive trust. First, the Association has not shown "active or egregious misconduct" that would constitute a "wrongful act." *See id.* ¶¶ 34–35. The Association alleges that Bear Hollow "underfunded the Association" and that Bear Hollow "knew of defects within the project and failed to disclose those defects to the Association." But the Association has provided no record support for these allegations. Furthermore, the district court's ruling indicates that Bear Hollow and Hamlet Homes complied with relevant laws. For example, the district court noted that Bear Hollow and Hamlet Homes "both have insurance as required by Utah law," that Hamlet Homes "was licensed as required by Utah law," and that Bear Hollow "turned over control of the

common areas to the Association in accordance with the Declaration." Accordingly, the district court acted within its discretion in concluding that the Defendants did not obviously receive funds by mistake or participate in egregious misconduct.

¶ 33 Second, the Association has not shown unjust enrichment. The Association argues that the Defendants "were unjustly enriched" because they retained the "benefit of sales proceeds after they failed to adequately fund the Association" and they "knew of defects within the Project and failed to disclose those defects to the Association." But these arguments rest on the alleged wrongful acts that the Association has failed to support. Further, the Association has not established an "equitable interest" in Bear Hollow's and Hamlet Homes' third-party claims against the subcontractors. *See Parks,* 673 P.2d at 600. The district court ruled that the Association, by asserting legal claims against Bear Hollow, did not gain an equitable interest in Bear Hollow's potential claims against third parties. On appeal, the Association does not attempt to identify the flaw in the district court's rationale or otherwise demonstrate how this ruling constituted an abuse of discretion. Accordingly, the Association has not carried its appellate burden of demonstrating error here. *See Simmons Media Group, LLC v. Waykar, LLC,* 2014 UT App 145, ¶ 37, 335 P.3d 885.

¶ 34 The Association further argues that the district court abused its discretion because "justice—and the ... requirement that an association have privity of contract with a party against whom it brings a claim for defective construction—necessitate a mechanism by which an association can benefit from [a developer's] claims against subcontractors in cases where [the developer] or builder" cannot, or will not, sue subcontrac-

tors. Although this argument has some appeal as a matter of policy, courts will impose a constructive trust for unjust enrichment only where "there has been (1) a wrongful act, (2) unjust enrichment, and (3) specific property that can be traced to the wrongful behavior." *Wilcox,* 2007 UT 39, ¶ 34, 164 P.3d 353. And as noted above, the Association failed to establish these elements. Consequently, a policy argument, however compelling, falls short of demonstrating that the district court abused its discretion.

¶ 35 Finally, the Association argues that because "a court may impose a constructive trust where a fiduciary duty exists," the district court should have done so here. This argument fails at the outset: if a court *may* impose a constructive trust in a certain situation, it follows that a court also *may not.* Arguing that the district court *may* have granted a constructive trust here does not meet the Association's burden of showing that the district court abused its discretion in refusing to do so.

B. The District Court Did Not Abuse Its Discretion in Refusing to Grant a Writ of Replevin and a Writ of Attachment.

¶ 36 The Association next contends that the district court erred in denying it a writ of replevin and a writ of attachment. Defendants respond that the Association "fails to provide the legal support and analysis necessary" to sustain these arguments.

¶ 37 A writ of replevin and a writ of attachment both qualify as prejudgment writs. *See* Utah R. Civ. P. 64A. And in addition to the requirements necessary for the specific writ, a party moving for any kind of prejudgment writ must meet the requirements of rule 64A of the Utah Rules of Civil Procedure. *Id.*[6] In addition to the require-

---

6. Under rule 64A(c) the movant must show "all of the requirements listed in subsections (c)(1) through (c)(3) and at least one of the requirements listed in subsections (c)(4) through (c)(10):

(c)(1) that the property is not earnings and not exempt from execution; and
(c)(2) that the writ is not sought to hinder, delay or defraud a creditor of the defendant; and

(c)(3) a substantial likelihood that the plaintiff will prevail on the merits of the underlying claim; and
(c)(4) that the defendant is avoiding service of process; or
(c)(5) that the defendant has assigned, disposed of or concealed, or is about to assign, dispose of or conceal, the property with intent to defraud creditors; or

ments under rule 64A, the movant must meet the requirements for the specific writ requested. For a writ of replevin, the movant must additionally show "that the plaintiff is entitled to possession" and "that the defendant wrongfully detains the property." *Id.* R. 64B. And for a writ of attachment, the movant must additionally show "that the defendant is indebted to the plaintiff" and either that "the action is upon a contract or is against a defendant who is not a resident of this state or is against a foreign corporation not qualified to do business in this state," or that "the writ is authorized by statute" and "that payment of the claim has not been secured by a lien upon property in this state." *Id.* R. 64C.

 ¶ 38 An adequately briefed argument "contain[s] the contentions and reasons of the appellant with respect to the issues presented … with citations to the authorities, statutes, and parts of the record relied on." Utah R.App. P. 24(a)(9). "[I]mplicitly, rule 24(a)(9) requires not just bald citation to authority but development of that authority and reasoned analysis based on that authority." *State v. Green,* 2004 UT 76, ¶ 13, 99 P.3d 820 (citation and internal quotation marks omitted). "An inadequately briefed claim is by definition insufficient to discharge an appellant's burden to demonstrate trial court error." *Simmons Media Group, LLC v. Waykar, LLC,* 2014 UT App 145, ¶ 37, 335 P.3d 885.

 ¶ 39 Here, the Association fails to show that the district court abused its discretion in refusing to grant a writ of replevin and a writ of attachment. First, the district court refused to grant the Association a writ of replevin because the Association failed to show that it was "entitled to possession" of the third-party claims as required by rule 64B of the Utah Rules of Civil Procedure. On appeal, the Association argues that Utah law requiring "subcontractor liability insur-

ance, and recent Utah caselaw requiring owners to sue subcontractors by way of pass-through claims against the seller, mean that the Association is entitled to [Defendants'] claims." For this argument the Association cites the entire opinion in *Davencourt at Pilgrims Landing Homeowners Ass'n v. Davencourt at Pilgrims Landing, LC,* 2009 UT 65, 221 P.3d 234, and a statute requiring contractors to maintain licenses, Utah Code Ann. § 58–55–301 (LexisNexis 2005). But the Association does not develop this authority or provide "reasoned analysis," *Green,* 2004 UT 76, ¶ 13, 99 P.3d 820, demonstrating why under these authorities the district court lacked discretion to deny the writ. Thus, the Association has failed to meet its burden of persuasion on appeal. *See Waykar,* 2014 UT App 145, ¶ 37, 335 P.3d 885.

 ¶ 40 Second, the Association fails to show that the district court abused its discretion in refusing to grant a writ of attachment. The district court refused to grant the Association a writ of attachment principally because the Association did not demonstrate that Defendants are "indebted to" the Association. *See* Utah R. Civ. P. 64C(b)(*l* ). The district court reasoned that if "indebted to" in rule 64C means nothing more than the plaintiff has a claim for relief, it would add nothing to the requirement in rule 64A(c)(3) that the claimant show "a substantial likelihood that the plaintiff will prevail on the merits of the underlying claim." *See id.* R. 64A(c)(3). The court further suggested that the "indebted to" requirement implied a liquidated amount due.

¶ 41 On appeal the Association does not challenge this reasoning. It merely asserts that Defendants "are indebted to the Association for, among other things, property damage and breach of fiduciary duties." It refers generally to "Utah's insurance laws" and cites *Davencourt.* But *Davencourt* never mentions a writ of attachment or any other

(c)(6) that the defendant has left or is about to leave the state with intent to defraud creditors; or
(c)(7) that the defendant has fraudulently incurred the obligation that is the subject of the action; or
(c)(8) that the property will materially decline in value; or

(c)(9) that the plaintiff has an ownership or special interest in the property; or
(c)(10) probable cause of losing the remedy unless the court issues the writ.
Utah R. Civ. P. 64A(c).

writ. *See* 2009 UT 65, 221 P.3d 234. So again, we conclude that the Association has not presented the level of "reasoned analysis" required to demonstrate that the district court abused its discretion in denying the writ. *See Green,* 2004 UT 76, ¶ 13, 99 P.3d 820 (citation and internal quotation marks omitted).

## CONCLUSION

¶ 42 For the foregoing reasons, the orders of the district court are affirmed.